**299 A.2d 441.**

SCHOOL COMMITTEE OF THE TOWN OF WESTERLY *vs.*
WESTERLY TEACHERS ASSOCIATION.

JANUARY 31, 1973.

PRESENT: Roberts, C.J., Paolino, Powers, Joslin and Kelleher, JJ.

KELLEHER, J.  Last September when the public school bells rang to announce the beginning of a new school year, there was one group whose response was something less than unanimous.  It was the schoolteachers.  In several communities they appeared at the schoolhouse doors not to teach but to picket.  A phrase was heard which until recently was usually uttered by those engaged in the private sector of employment.  It was "no contract, no work."

The town of Westerly was one such community.  On September 1, 1971, the school committee and the Westerly Teachers Association had entered into a collective bargaining agreement concerning the "hours, salary, working conditions and other terms and conditions of professional employment of the teachers."  The contract was for a two-year period and contained a wage reopening clause for the 1972-73 school year.  Subsequent wage negotiations proved fruitless.  Arbitrators were appointed pursuant to the rele-

vant provisions of G. L. 1956 (1968 Reenactment) ch. 9.3 of title 28, the School Teachers' Arbitration Act. However, since the arbitrators' unanimous decision related to "matters involving the expenditure of money," it was not binding and was rejected by the school committee. Matters reached an impasse in late August, 1972.

September 5, 1972 was teachers' orientation day. A substantial number of the teachers failed to attend the scheduled meetings. The next day was the first day of school. The students appeared but, once again, the teachers were conspicuous by their absence from the classrooms. At 10 a.m., the committee closed the schools and shortly thereafter a complaint was submitted to a justice of the Superior Court. He then issued an ex parte temporary restraining order which enjoined the strike and ordered the teachers to return to work. On September 7, 1972, the association sought from us certiorari and a stay of the Superior Court's order. We issued the writ but denied the request for a stay. Thereafter, the strike ended and school began in Westerly.

Our issuance of the writ has been motivated by the fact that within recent times, each and every time the public schools of our state have resumed operations after summer vacation, teachers in many of the public school systems have refused to return to their classrooms claiming that they have a right to strike. We have agreed to review the issuance of the Superior Court's restraining order because it is intertwined with an issue of substantial public interest which is capable of repetition yet evading review. *Moore* v. *Ogilvie*, 394 U. S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969); *Chernov Enterprises, Inc.* v. *Scuncio*, 107 R. I. 439, 268 A.2d 424 (1970). In doing so, we are reassessing a position first taken in *City of Pawtucket* v. *Pawtucket Teachers' Alliance*, 87 R. I. 364, 141 A.2d 624 (1958), and reaffirmed just about six years ago in *Pawtucket School Committee* v. *Pawtucket Teachers' Alliance*, 101 R. I. 243,

221 A.2d 806 (1966). The holding first expressed in 1958 states that striking by public schoolteachers is illegal and subject to being enjoined. We see no reason why this principle should be modified.

There is no constitutionally protected fundamental right to strike. In 1926, Mr. Justice Brandeis wrote that neither the common law nor the Fourteenth Amendment conferred the absolute right to strike. *Dorchy* v. *Kansas,* 272 U. S. 306, 47 S.Ct. 86, 71 L.Ed. 248 (1926). It was pointed out in *United Federation of Postal Clerks* v. *Blount,* 325 F. Supp. 879 (D.D.C. 1971), *aff'd,* 404 U. S. 802, 92 S.Ct. 80, 30 L.Ed.2d 38 (1971), that at common law no employee whether private or public had a constitutional right to strike in concert with fellow workers because such an association was often regarded as an illegal conspiracy which was punishable under the criminal law. The conspiracy weapon was removed and the private employees' right to strike became fully protected with the passage of sec. 7 of the National Labor Relations Act, 49 Stat. 449 (1935). *See International Union, U.A.W.A., A.F.L., Local* 232 v. *Wisconsin Employment Relations Board,* 336 U. S. 245, 69 S.Ct. 516, 93 L.Ed. 651 (1949). In the years that have ensued since the first Pawtucket schoolteachers' case, there has not been any instance where any court has held that public employees have a constitutional right to strike.

The diffusion of knowledge through the use of the public school system so that the advantages and opportunities afforded by education will be made available to the people is the constitutional responsibility of the state.[1] Article

---

[1]The teachers could consider this constitutional responsibility as a mixed blessing. While it acts as a deterrent to their ability to strike, it has its benefits. In 1947, the General Assembly, while referring to the state's obligation in the area of public education, authorized the payment by the state of an annual salary grant of $600 to every regularly employed public schoolteacher with the proviso that the grant could not be used to give a teacher an annual salary in excess of $5,000. Public

XII, sec. 1 of the Rhode Island constitution. This responsibility is carried on at the local level by the school committee as an agent of the state.

The state has a compelling interest that one of its most precious assets—its youth—have the opportunity to drink at the font of knowledge so that they may be nurtured and develop into the responsible citizens of tomorrow. No one has the right to turn off the fountain's spigot and keep it in a closed position. Likewise, the equal protection afforded by the fourteenth amendment does not guarantee perfect equality. There is a difference between a private employee and a public employee, such as a teacher who plays such an important part in enabling the state to discharge its constitutional responsibility. The need of preventing governmental paralysis justifies the "no strike" distinction we have drawn between the public employee and his counterpart who works for the private sector within our labor force.

A thorough compilation of cases covering all facets of a public employee's right to strike can be found in Annot., 37 A.L.R.3d 1147 (1971). A study of this annotation makes it perfectly clear that a judicial or legislative interdiction

---

Laws 1947, ch. 1887, art. IX, sec. 2. The term "teacher" included such individuals as superintendents, principals, supervisors and teachers. Later, in 1960, the Legislature enacted a comprehensive program of state aid to the various municipal and regional school districts. The legislation requires the state to pay a share of the costs of all new school construction and it also established a statewide minimum salary scale for teachers ranging from a beginning salary of $4,000 averaging up in 12 annual steps to $6,000. Sections 16-7-29 and 35. It is a matter of common knowledge that the salaries currently being paid to "certified school personnel" are far in excess of the statutory minimums mandated in 1960 by the passage of §16-7-29. Certified school personnel include teachers and such people of diverse talents as nurses and librarians. Much of the progress made in this regard has to be attributed, at least in some degree, to the collective bargaining procedures authorized by the passage in 1966 of the School Teachers Arbitration Act.

against strikes by public employees does not constitute involuntary servitude or an unwarranted impingement on one's constitutional rights be they of free speech, assembly, due process or equal protection.

The teachers argue, however, that in the time that has elapsed since the first Pawtucket schoolteachers' case, the United States Supreme Court has treated public employees in such a way as to afford them rights previously denied them. They point to the holdings in *Keyishian* v. *Board of Regents,* 385 U. S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), and *Garrity* v. *New Jersey,* 385 U. S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).

In *Keyishian,* the Supreme Court described the classroom as the "marketplace of ideas" and invalidated the New York teachers' oath and loyalty law on the basis that their vagueness and ambiguity posed an unconstitutional threat to the teachers' right of free speech. The *Garrity* case dealt with a criminal conviction based upon evidence given by some defendants after they had been told that if they exercised their right against self-incrimination during an investigation of their conduct as policemen, they might be discharged. These cases are of no assistance to the teachers because here there is no effort being made to inhibit the give-and-take that goes on in the classroom between teacher and pupil nor are we concerned with any violation of the fifth amendment right.[2]

Having failed in their efforts to persuade us that the right to strike has been elevated to constitutional status, the teachers point to various actions taken by the General Assembly and take the position that they have an implied

---

[2]It should be noted that the Supreme Court's affirmance of *Blount* is found in a one-sentence opinion which shows that only Mr. Justice Douglas thought the case should be heard on oral argument. 404 U. S. 802, 92 S.Ct. 80, 30 L.Ed.2d 38 (1971). In *Blount,* it was held that Congress could prohibit public employees from striking.

right to strike. They embark on this effort by first pointing out that the General Assembly in its several enactments according collective bargaining rights to various groups of public employees has specifically stated that they shall not have the right to strike and then stress the absence of any such language as it concerns the teaching profession. The teachers look upon the legislative silence as implicit permission to go on strike. We disagree.

The School Teachers' Arbitration Act became law during the January, 1966 session of the General Assembly. We need only set forth the following excerpt:

"28-9.3-1. Declaration of policy—Purpose.— * * *"
"It is hereby declared to be the public policy of this state to accord to certified public school teachers the right to organize, to be represented, to negotiate professionally and to bargain on a collective basis with school committees covering hours, salary, working conditions and other terms of professional employment, provided, however, that nothing contained in this chapter shall be construed to accord to certified public school teachers the right to strike."

While this section fails to contain an express prohibition against a strike, it certainly does not give the public schoolteachers the right to strike. On such a vital issue, we will not attribute to the General Assembly an intent to depart from the common law unless such an intent is expressly and unmistakably declared. *Johnston Businessmen's Ass'n v. aaRussillo*, 108 R. I. 257, 274 A.2d 433 (1971). If the Legislature wishes to give the public school pedagogues the right to strike, it must say so in clear and unmistakable language. Accordingly, we find no legislation implicitly granting such a right to the teachers of this state.

The sentiments we have just expressed relative to the implicit right to strike apply equally as well to the teachers' contention that their dispute with the school committee was subject to the anti-injunction provisions of §28-

10-2.[3] In the first Pawtucket schoolteachers' case we rejected this argument. The only additional comment that might be made is that if striking public employees are to be given the advantages of the anti-injunction statute, such action will have to result from legislative action rather than judicial construction.

The teachers' inability to enjoy the benefits of the legislation which severely limits the Superior Court's jurisdiction to enjoin a labor dispute does not mean that every time there is a concerted work stoppage by public employees, it shall be subject to an automatic restraining order. Rule 65(b) of Super. R. Civ. P. specifically states that no temporary restraining order shall be granted without notice to the adverse party unless it clearly appears from specific facts by affidavit or verified complaint that irreparable harm will result before notice can be served and a hearing held.

We must concede that the mere failure of a public school system to begin its school year on the appointed day cannot be classified as a catastrophic event. We are also aware that there has been no public furor when schools are closed because of inclement weather, or on the day a presidential candidate comes to town, or when the basketball team wins the championship. The law requires that the schools be in session for 180 days a year. General Laws 1956 (1969 Reenactment) §16-2-2. There is a flexibility in the calendaring of the school year that not only permits the makeup of days which might have been missed for one reason or another but may also negate the necessity of the immediate

---

[3]This statute provides that no injunction shall issue in a case involving a labor dispute unless and until there has been a hearing in open court. The trial justice is required to make certain specific findings including a determination that the public officials charged with the responsibility of protecting the plaintiff's property are unable or unwilling to do so. See *Almac's, Inc.* v. *R. I. Grape Boycott Committee*, 110 R. I. 36, 290 A.2d 52 (1972).

injunction which could conceivably subject some individuals to the court's plenary power of contempt.

It is true that the issuance of an interlocutory injunction lies within the sound discretion of the trial justice. The temporary restraining order was entered in the case at bar upon the verified complaint of the chairman of the school committee in which it is averred that schools had not opened as scheduled and that irreparable harm would be sustained by the students, parents and citizens of Westerly. We think that in the light of what we have just said such a declaration will no longer justify ex parte relief. In making such a statement, we wish to make it clear that we are not faulting the trial justice. We are well cognizant that the temporary restraining order now before us was entered subsequent to the entry of another temporary restraining order by another justice of the Superior Court in a case involving a strike by the teachers in the Chariho School District. We stayed that order whereupon the District's school committee withdrew its complaint.[4] Counsel for petitioners and respondents concede that the trial justice in the pending cause made it clear that he had signed the restraining order solely in the interest of having a uniformity of practice in the issuance of restraining orders, both of which were requested within hours of each other.

Ex parte relief in instances such as teachers-school committee disputes can make the judiciary an unwitting third party at the bargaining table and a potential coercive force in the collective bargaining processes. We embrace the position taken in *School District* v. *Holland Education Ass'n*, 380 Mich. 314, 157 N.W.2d 206 (1968), where it was held that the trial court, before giving affirmative relief, should normally conduct a hearing where it would review what has gone on between the disputants and then deter-

---

[4]*See Chariho Regional High School District* v. *Chariho Teachers' Ass'n*, 110 R. I. 922, 294 A.2d 846 (1972).

mine whether injunction should issue and if so, on what terms and for what period of time.

In conclusion, we would emphasize that the solution to the complex problem involving public schools, teachers and collective bargaining rests within the capable hands of the members of our Legislature. They will not want for proposed answers. During its January, 1969 session, the General Assembly created a "Commission to Study the Ways and Means of Avoiding and Resolving Impasses Which Arise During Contract Negotiations Between School Teachers' Organizations and School Committees." The commission's report was published on March 2, 1970. A majority of the commission recommended compulsory and binding arbitration on all matters. Another commissioner asked for a qualified right to strike while two others declared that "teachers have an ethical, moral and professional right to withhold their services." One commission member took a neutral position by endorsing neither the Majority Report nor any of the Minority Reports. The diverse opinions expressed within the commission are ample proof that the policy to be followed is the one which must be laid out by the members of the Senate and House of Representatives.

The petition for certiorari is granted; the temporary restraining order is quashed pro forma and the papers in the case are returned to the Superior Court.

Mr. Chief Justice Roberts, dissenting. The majority has asserted that "[t]here is no constitutionally protected fundamental right to strike." Moreover, the majority states that since there is no constitutional right to strike, the teachers must obtain this right in a clear and

unmistakable grant from the Legislature. From these contentions, I must dissent.[1]

The right to strike was never explicitly granted to any employees, public or private. The labor union and the strike arose out of economic struggle and not by the action of any legislature. Chief Justice Taft recognized the right of employees to strike long before the National Labor Relations Act (NLRA), 29 U.S.C.A. §151. et seq., was passed. He described the development of the strike as follows:

> "Is interference of a labor organization by persuasion and appeal to induce a strike against low wages under such circumstances without lawful excuse and malicious? We think not. Labor unions are recognized by the Clayton Act as legal when instituted for mutual help and lawfully carrying out their legitimate objects. They have long been thus recognized by the courts. They were organized out of the necessities of the situation. A single employee was helpless in dealing with an employer. He was dependent ordinarily on his daily wage for the maintenance of himself and family. If the employer refused to pay him the wages that he thought fair, he was nevertheless unable to leave the employ and to resist arbitrary and unfair treatment. Union was essential to give laborers opportunity to deal on equality with their employer. They united to exert influence upon him and to leave him in a body in order by this inconvenience to induce him to make better terms with them. They were withholding their labor of economic value to make him pay what they thought it was worth. The right to combine for such a lawful purpose has in many years not been denied by any court. The strike became a law-

---

[1]I am aware of the authorities cited by the majority for the proposition that there is no constitutional right to strike and, more particularly, no such right for public employees. However, I must concur with Chief Justice DeBruler of Indiana in that these authorities offer no compelling reasoning supporting a per se rule against strikes by public employees. *Local 519, Anderson Federation of Teachers* v. *School City of Anderson,* 252 Ind. 558, 566, 251 N.E.2d 15, 19 (1969).

ful instrument in a lawful economic struggle or competition between employer and employees as to the share or division between them of the joint product of labor and capital." *American Steel Foundries* v. *Tri-City Central Trades Council,* 257 U. S. 184. 208-09, 42 S.Ct. 72, 78, 66 L.Ed. 189, 199-200 (1921).

Nowhere in the NLRA or other labor legislation does Congress expressly grant to employees the right to strike. Rather, in my opinion, this legislation was enacted for the protection of a right already possessed. Such protection was necessary to curb the repressive attitude of many state courts toward labor organizations and their activities. I reiterate that the legislation did not create any new rights for employees, for such rights would still exist if §7 of the NLRA were repealed. *Allen Bradley Local No. 1111* v. *Wisconsin Employment Relations Board,* 237 Wis. 164, 177, 295 N.W. 791, 797 (1941), *aff'd* 315 U. S. 740, 62 S.Ct. 820, 86 L.Ed. 1154 (1942). The fact is that §7 of that act makes no mention of the right to strike. In §13 thereof reference is made to the right to strike as follows: "Nothing in this Act, except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right." Obviously, §13 is a rule of construction. *Local 232, UAW* v. *Wisconsin Employment Relations Bd.,* 336 U. S. 245, 259, 69 S.Ct. 516, 524, 93 L.Ed. 651, 665-66 (1949). It is my opinion that the NLRA recognized the rights which labor already had and was intended to afford those rights extensive legislative protection.

Having concluded that the right to strike accrues to labor, not by legislative grant, but by the irresistible thrust of socio-economic forces, I turn to the question of whether the right to strike is within the protection of the constitutional guarantees. The Supreme Court has long recognized that the right of labor to organize and to bargain collectively is a fundamental right with constitutional protec-

tion. *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 33-34, 57 S.Ct. 615, 622-23, 81 L.Ed. 893, 909 (1937). Obviously, the right to strike is essential to the viability of a labor union, and a union which can make no credible threat of strike cannot survive the pressures in the present-day industrial world. If the right to strike is fundamental to the existence of a labor union, that right must be subsumed in the right to organize and bargain collectively. *Bayonne Textile Corp.* v. *American Federation of Silk Workers*, 116 N.J.Eq. 146, 152-53, 172 A. 551, 554-55 (1934).

I am persuaded that if the right to organize and to bargain collectively is constitutionally protected, then the right to strike, that is, for persons similarly situated to act in concert to promote and protect their economic welfare, must be an integral part of the collective bargaining process. That being so, it follows that it must be within the protection of the constitutional guarantees of the First Amendment. The collective bargaining process, if it does not include a constitutionally protected right to strike, would be little more than an exercise in sterile ritualism.[2]

---

[2]I attach great significance to the language used by J. Skelly Wright, Circuit Judge, in his concurring opinion in *United Federation of Postal Clerks* v. *Blount*, 325 F.Supp. 879 (D.D.C. 1971). The majority of the three-judge court in that case held that no employee, public or private, at common law had a constitutional right to strike and further held that public employees, in the absence of a statute, do not possess the right to strike. However, Judge Wright in his concurrence said at 885: "It is by no means clear to me that the right to strike is not fundamental. The right to strike seems intimately related to the right to form labor organizations, a right which the majority recognizes as fundamental and which, more importantly, is generally thought to be constitutionally protected under the First Amendment — even for public employees. * * * If the inherent purpose of a labor organization is to bring the workers' interests to bear on management, the right to strike is, historically and practically, an important means of effectuating that purpose. A union that never strikes, or which can make no credible threat to strike, may wither away in ineffectiveness. That fact is not irrelevant to the constitutional cal-

I find further support for the proposition of the right of employees to strike in the First and Fifth Amendments to the Constitution of the United States. The First Amendment's protection of freedom of speech and freedom of association have been extended to union organizational activities. *Thomas* v. *Collins,* 323 U. S. 516, 532, 65 S.Ct. 315, 323-24, 89 L.Ed. 430, 441 (1945); *Hague* v. *CIO,* 307 U. S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). Moreover, the right to select bargaining representatives has been declared to be a property interest protected by the Clayton Act. *Texas & N.O. R.R.* v. *Brotherhood of Ry. & S.S. Clerks,* 281 U. S. 548, 571, 50 S.Ct. 427, 434, 74 L.Ed. 1034, 1046-47 (1930). Such property interest would also be protected by the due process clause of the Fifth Amendment. In view of the fact that the protection of the First and Fifth Amendments is not alien to labor activity, I would conclude that the penumbra of those amendments protects individual workers while acting in concert to further their economic goals. Such activity by necessity includes the right to strike.

Being of the opinion that the right to strike is constitutionally protected, I turn to the question whether public employees, by reason of such employment, have forfeited that right. I think not. No waiver of constitutional rights is contemplated by public employment. *Keyishian* v. *Board of Regents,* 385 U. S. 589, 605-06, 87 S.Ct. 675, 685, 17 L.Ed.2d 629, 642 (1967); *Garrity* v. *New Jersey,* 385 U. S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562, 567 (1967).

In the first place, I cannot agree that every strike by public employees necessarily threatens the public welfare and governmental paralysis. Merely because a group of em-

culations. Indeed, in several decisions, the Supreme Court has held that the First Amendment right of association is at least concerned with essential organizational activities which give the particular association life and promote its fundamental purposes."

ployees is working for the government, it does not follow
that their collective withholding of the services performed
will have a substantial adverse effect upon the interests of
society. The fact is that in many instances strikes by pri-
vate employees pose the far more serious threat to the pub-
lic interest than would many of those engaged in by public
employees. It is elementary that the services performed
by people employed in the private sector are in many in-
stances so essential to the orderly operation of society that
the health, safety, and welfare of the community would be
substantially endangered were they to strike. It is not dif-
ficult to visualize the adverse effect on the public interest
of a strike by the employees of a privately operated hos-
pital or of a public utility. On the other hand, it could
be extremely difficult to conjure up such a threat to the
public interest arising out of a strike of the employees of
a recreation department of a municipality or of the clerical
staff of a state agency. In short, it appears to me that to
deny all public employees the right to strike because they
are employed in the public sector would be arbitrary and
unreasonable.

Underlying the argument of those who say public em-
ployees have no right to strike is the notion that one can-
not strike against the sovereign. This idea finds its basis
in the same philosophy which dictates that one cannot sue
the sovereign. The doctrine emanates from the concept of
English law that the King could do no wrong and that the
sovereign was above the courts. In recent years, sovereign
immunity in tort law has been extensively criticized as an
anachronism, and many states, including Rhode Island,
have through their highest courts abandoned the doctrine
in whole or in part. *Becker* v. *Beaudoin*, 106 R. I. 562, 261
A.2d 896 (1970). Perpetuation of the doctrine of sover-
eign immunity in tort law led to a great many inequities,
its application effecting many incongruous results. Simi-

larly, the application of the doctrine that one cannot strike against the sovereign leads to unfair results. Clinging to a doctrine that prohibits employees of the government the right to strike denies those individuals their constitutional right while applying an idea that is archaic and no longer logically supportable.

In asserting my conviction that public employees have a constitutionally protected right to strike, I am not over-looking the police power of the state. I am fully aware that the Legislature has the inherent power to exercise the police power to protect the health, safety, and welfare of society. The police power may be invoked not only to prohibit strikes on the part of public employees but, where the effect of a strike would be to threaten the public inter-est, to forbid strikes by employees in the private sector. But surely the police power may be exercised where a strike on the part of public employees would curtail an essential public service.

In *Local 232, UAW* v. *Wisconsin Employment Relations Bd., supra,* at 259, 69 S.Ct. at 524, 93 L.Ed. at 666, the Court said: "The right to strike, because of its more serious im-pact upon the public interest, is more vulnerable to regula-tion than the right to organize and select representatives for lawful purposes of collective bargaining which this Court has characterized as a 'fundamental right' and which, as the Court has pointed out, was recognized as such in its deci-sions long before it was given protection by the National Labor Relations Act. *Labor Board* v. *Jones & Laughlin,* 301 U. S. 1, 33." Obviously, the Court in that case was recognizing the susceptibility of the right to strike to regu-lation by the state or, in other words, that where the public interest would be adversely affected by employees exercising the right to strike, the state may, by a valid exercise of the police power, prohibit such a group from striking.

In so doing, however, the Legislature must be cognizant

of the guarantees of due process and equal protection. Thus, Congress enacted the Taft-Hartley Law and the Railway Mediation Act, which empower the President to enjoin strikes temporarily when national security is threatened. Included in those laws, however, are provisions for federal arbitration and mediation. The Legislature of this state has demonstrated its awareness that the police power can be used most efficaciously to prohibit striking by public employees where such a strike could affect adversely the public safety and welfare. It in the past has granted to policemen and firefighters, in prohibiting these groups from striking, a system of compulsory binding arbitration "* * * to provide some alternative mode of settling disputes where employees must, as a matter of public policy, be denied the usual right to strike." General Laws 1956 (1968 Reenactment) §§28-9.1-2 and 28-9.2-2. In short, where the public welfare demands a curtailment of the right of certain public employees to strike, the General Assembly may act, but it must provide a quid pro quo which effectuates those employees' right to act in concert to protect their economic well-being.

I subscribe, then, to the proposition that the right to strike is fundamental and is an integral part of the collective bargaining process. I further hold that the right to strike as an inherent component of the collective bargaining process is constitutionally protected for the benefit of those employed in the public sector as well as those employed in the private sector. I recognize, however, that the state may, by a valid exercise of the police power, proscribe an exercise of the right to strike with respect to those employed in areas of the public service where to permit its exercise would be to make probable an adverse effect on the public health, safety, or welfare.

*Vincent J. Piccirilli, Robert A. Liguori,* Town Solicitor, for plaintiff-respondent.

*Natale L. Urso, Robert H. Chanin* (National Education Association), for defendant-petitioner.

*Julius C. Michaelson, Richard A. Skolnik,* (on behalf of Amicus Curiae-American Federation of Teachers, AFL-CIO, and Rhode Island Federation of Teachers, AFL-CIO).