**EXETER–WEST GREENWICH
REGIONAL SCHOOL
DISTRICT**
v.
**EXETER–WEST GREENWICH TEACH-
ERS' ASSOCIATION et al.**

**EXETER–WEST GREENWICH
REGIONAL SCHOOL
DISTRICT**
v.
**STATE of Rhode Island et al.**

**Linda K. DARCY et al.**
v.
**EXETER–WEST GREENWICH RE-
GIONAL SCHOOL DISTRICT
COMMITTEE et al.**

Nos. 84–442–M.P., 84–461–M.P. and
84–444–Appeal.

Supreme Court of Rhode Island.
Feb. 14, 1985.

Bradford Gorham, Gorham & Gorham, Providence, for Exeter-West Greenwich School Dist.

James E. Purcell and Peter Lacouture, Tillinghast, Collins & Graham, Providence, for Linda K. Darcy.

Donald M. Gregory II, Wickford, for Town of Exeter.

Donald G. Elbert, Jr., Asst. Atty. Gen., Providence, for State of R.I.

Richard A. Skolnik, Lipsey & Skolnik, Providence, amicus curiae for R.I. Federation of Teachers.

Michael St. Pierre, Revens & DeLuca, Warwick, for Town of North Kingstown School Committee.

John Roney, Roney & Labinger, Providence, amicus curiae for R.I. League of Cities & Towns.

Natale L. Urso and Thomas J. Liguori, Jr., Urso, Liguori & Urso, Westerly, for Exeter-West Greenwich Teachers' Assoc.

Michael Ursillo, Providence, for intervenor Kenny's Bus Service.

Frank J. Williams, Providence, for intervenor Galloway School Lines.

V. James Santanielli, Manning, West, Santaniello & Pari, Providence, for Town of West Greenwich.

Howard Haronian, Haronian, Paguin & Bramley, Inc., Warwick, for Bd. of Regents.

Gerard Cobleigh, Cobleigh, Watt, Rock & Giacobbe, Warwick, for Council 94 AFSMCE.

Forrest Avila, Legal Counsel to Com'r of Educ., Providence, for Dept. of Educ.

## OPINION

SHEA, Justice.

Before us is a tangle of litigation that includes two cases from the State Board of Regents for Education and two cases from the Superior Court. These cases have been consolidated for our review. An additional allied case awaits resolution in the Superior Court. The events that gave rise to the underlying controversy began on February 27, 1984.

By way of background, the Exeter-West Greenwich Regional School District (the district) was established by agreement between the towns of Exeter and West Greenwich and was ratified by the General Assembly in P.L.1965, ch. 80. Evidence presented in the several cases establishes that the district provides its own schools for grades kindergarten through grade 8. Students in grades 9 through 12 are educated at North Kingstown High School, the cost of which is borne by the district under contract with North Kingstown. The district currently has a five-year contract with North Kingstown covering the period beginning July 1, 1983, and continuing to June 30, 1988. There are additional contracts in effect for transportation and other services.

The appropriating body for the district is the regional school-district financial meeting that is open to all voters of Exeter and West Greenwich. We use the phrase "appropriating body" advisedly because the financial district meeting does not actually appropriate the money in the same sense that a financial town meeting does. Our reasons are that under P.L.1965, ch. 80, § 2, § VII(E), no discretion is left to the town within the regional district as to the amount of funding to be raised or expended. That section provides that the town must make a part of its budget the amount necessary to meet the budget approved by the district financial meeting. The language of that section provides that the money *"shall be appropriated in full* by the financial town meeting." (Emphasis added.) A budget is proposed by the regional district school committee and is adopted at the financial meeting, member towns being required to pay their allocated shares to the district. The district's fiscal year runs from July 1 to June 30. The district itself has no tax collector. The funds to operate the system are raised by the member towns through property assessment and taxation.

A regional district financial meeting was called to appropriate funds for the 1984–85 year on February 27, 1984. The school committee for the district proposed a budget of $4,210,075. This budget was to be funded by anticipated revenues from state aid to education of $2,091,138 (which was an increase of about $400,000 from the year before), from interest and other miscellaneous receipts amounting to $20,200, and from $2,098,737 from the towns of Exeter and West Greenwich. At the meeting, by a majority vote, the overall amount of the budget was reduced by approximately $400,000 to $3,809,880. This reduction did not appear to be the result of any financial crisis because the proposed budget would not have required any increases in taxes. The $400,000 increase in state-aid funds would have fully covered the budget increase over the previous year. In effect, what the financial meeting did was to reduce the amount of the proposed budget to the previous year's appropriation, thereby reducing by $400,000 what the combined

towns would have to appropriate. In essence then it would appear that they used the increased state-aid-to-education funds to reduce the taxes of the towns of Exeter and West Greenwich.

On April 23, 1984, the district school committee, after attempting to reduce its budget to the amount appropriated, called a special regional district financial meeting at which it sought restoration of $300,000 of the $400,000 that had been eliminated at the February meeting. By majority vote, the proposed restoration was rejected.

As the July 1 fiscal year approached, the district school committee found itself in a deficit position within the meaning of the Lamb Act, so-called, P.L.1980, ch. 152, now codified at G.L.1956 (1981 Reenactment) §§ 16-2-18, and 16-2-21, and § 16-3-11(a), as amended by P.L.1981, ch. 397, § 1, which prohibits regional school districts from making any expenditures or incurring any liabilities not authorized at the regional school-district meeting. The school committee brought a declaratory judgment action on behalf of the district in the Superior Court, Washington County, on June 1, 1984, seeking instructions about what action it should take and what interim authority it had to pay bills or salaries pending resolution of the budget. The Superior Court entered an order on June 15, 1984, giving the district treasurer interim authority to pay the obligations of the district and referred the matter to the State Commissioner of Education for resolution. That case was decided by the commissioner on August 31, 1984, appealed to the Board of Regents for Education, which rendered a decision on September 13, 1984, affirming the commissioner, and is now before this court as No. 84-461-M.P. The commissioner had made findings that there was in fact a deficit of approximately $325,000 as of August 31, 1984, which funds would have to be appropriated, that further additional savings could not be found in the proposed budget, and that 94 percent of the proposed budget was earmarked for salaries, tuition, and transportation, all contractual obliga-tions of the committee, the remaining 6 percent of the budget being for fuel and textbooks as mandated by § 16-23-2.

At the time that the school committee was filing its action for declaratory judgment, the Exeter-West Greenwich Teachers' Association (teachers) filed an unfair-labor-practice charge with the State Labor Relations Board against the district committee under G.L.1956 (1979 Reenactment) § 28-7-13 as amended by P.L.1979, ch. 126, § 1. The basis of the charge was the committee's refusal to sign a contract incorporating the terms of a November 1983 arbitrator's award. Representatives of the teachers and of the committee had worked together and had drafted a document that embodied the entire arbitration award. Although the district committee never signed the agreement, it never indicated that it would not sign it or that it would not perform any part of it. Chief among the terms of the award and the unsigned contract was that covering pay raises for the teachers over a three-year period—a 7 percent increase for 1983-84 starting March 1, 1984, a 7.2 percent increase for 1984-85, and a 7.9 percent increase for 1985-86. The school committee had previously implemented the first increase in the award for the 1983-84 school year, the district having sufficient funds to pay the scheduled increase during that period.

The Labor Relations Board held hearings and on September 13, 1984, rendered a decision that the arbitrator's award was contractually binding on the district, and ordered the district "immediately [to] execute the collective bargaining agreement." That decision and order have been appealed to the Superior Court by both parties. No decision has been rendered to date.

The opening day for school had been set for August 29, 1984, and a teacher orientation day had been set for August 28. At a meeting on August 14, 1984, the superintendent of schools for the district was instructed to reduce the salaries to the scale of the first half of the 1983-84 period with appropriate step increases. This was the

scale that had been in effect prior to any pay increases granted in the arbitrator's award. The $3,800,000 that had been appropriated was sufficient to cover this reduced salary scale and the other contractual obligations of the district. The teachers reacted by striking.

The district committee brought suit in Superior Court requesting an injunction against the strike. After hearings on September 4, 5, and 6, 1984, the trial justice, after making appropriate findings, rendered a bench decision ordering the teachers to return to work conditional on the school committee's agreeing to pay the salary scale for the 1984–85 school-year period provided for in the arbitrator's award. The trial justice imposed that condition because he found that by taking certain actions consistent with the arbitrator's award, such as implementing the first pay increase, implementing the increase in class size, adopting and paying for Delta Dental benefits, adhering to certain grievance provisions of the award, in essence, by adopting and implementing most of the provisions of the award (all except the second pay raise), the committee, after a hearing on the merits, would most likely be found to have accepted the award and was thereby bound by it. Under this view, the committee was before the court with "unclean hands" and was therefore ordered to comply with and abide by the terms of the arbitrator's award. That decision is now before us as No. 84–442–M.P.

▆ Although the conditional injunction was later superseded by an unconditional injunction, we believe it is appropriate at this juncture to address the school committee's argument that it was error for the trial justice to consider the equitable doctrine of unclean hands. After he had done so, he granted the injunction against the strike but only on the condition that the school committee implement the salary payments given in the arbitrator's award. We can understand the trial justice's motivation. He had before him the deliberate actions of the regional financial meeting

and school committee in the face of what clearly appeared to him to be a binding contract. In *School Committee of Westerly v. Westerly Teachers Association*, 111 R.I. 96, 299 A.2d 441 (1973), this court said that before a trial justice can enter a restraining order against a strike, there must first be a hearing where he or she "would review what has gone on between the disputants and then determine whether [an] injunction should issue and if so, on what terms and for what period of time." *Id.* at 104–05, 299 A.2d at 446. However, in *Menard v. Woonsocket Teachers' Guild-AFT 951*, 117 R.I. 121, 363 A.2d 1349 (1976), the court had an opportunity to discuss this concept again and stated quite clearly that in these teacher-strike controversies the trial justice does not consider the equities between the parties. Here, the trial justice found that there was an illegal strike taking place, that there was no reasonable prospect for an end to the strike unless an injunction was issued, that irreparable harm was being done to the students, and that there were no alternative administrative or legislative remedies available. These findings, particularly that irreparable harm was being done to the students, provided adequate justification for the issuance of a restraining order that would have quickly brought the strike to an end, thereby avoiding continued irreparable harm. It was error, however, to grant the injunction conditionally. In doing so, the trial justice was balancing the equities between the parties which we have said in *Menard* is irrelevant in determining whether an injunction should issue.

Subsequent to the issuance of the injunction, the school committee met on September 6, 1984. The motion to pay the teachers' salary awarded by the arbitrator for the 1984–85 school year failed of passage. The strike continued.

The following day, September 7, 1984, a group of parents whose children were enrolled in the district's schools took action. First, the group filed an appeal to the Commissioner of Education from the district

committee's refusal to pay increased teachers' salaries. This appeal was brought under the provisions of § 16–39–2, which permits any aggrieved person to appeal to the Commissioner of Education any matter arising under any law relating to schools or education. Second, the same parents filed an action in the Superior Court asking for a mandatory injunction ordering the committee to pay the increased salaries provided for in the arbitrator's award, which payment would trigger an injunction against the strike. In the appeal to the commissioner, heard on September 10, 1984, little new evidence was heard. The commissioner instead relied on the transcript from the Superior Court hearings on the petition for injunction held on September 4, 5, and 6, 1984. The commissioner the same day rendered a decision in which he found that the refusal of the school committee to implement the arbitrator's award was "arbitrary, capricious, unreasonable, and without any rational basis." He further ruled, "It is expected that the School Committee will honor the arbitrator's award *on an interim basis, open the schools,* and accept the conditions of the Judge's injunction, which will end the illegal teachers' strike." The commissioner's decision was affirmed by the Board of Regents and is now before us as part of No. 84–461–M.P.[1]

Meanwhile, the Superior Court case filed by the parents was heard on September 12, 1984, before the same justice who had entered the injunction. His decision was rendered on September 13, 1984. He made reference to his earlier decision and concluded that the district's failure to comply with the condition he had set was unreasonable because noncompliance had kept the schools closed, that the school committee had very likely entered into a contract with the teachers and was bound by the terms, and that compliance with the condition he had imposed would cause no harm to the defendant school committee whereas non-compliance was causing enormous harm to the children. We pause to make clear that school teachers have no right to strike, and that the strike in question was clearly illegal. In *Westerly School Committee, supra,* this court said:

"The state has a compelling interest that one of its most precious assets—its youth—have the opportunity to drink at the font of knowledge so that they may be nurtured and develop into the responsible citizens of tomorrow. No one has the right to turn off the fountain's spigot and keep it in a closed position. Likewise, the equal protection afforded by the fourteenth amendment does not guarantee perfect equality. There is a difference between a private employee and a public employee, such as a teacher who plays such an important part in enabling the state to discharge its constitutional responsibility. The need of preventing governmental paralysis justifies the 'no strike' distinction we have drawn between the public employee and his counterpart who works for the private sector within our labor force." 111 R.I. at 100, 299 A.2d at 443–44.

In this case, the trial justice directed the entry of an order providing that the school committee

"forthwith take whatever action is necessary to re-open schools in accordance with the document entitled 'Agreement between The Exeter-West Greenwich Regional School District Committee and The Exeter-West Greenwich Regional District Teachers' Association covering the period September 1, 1983 to August 31, 1986' which was Exhibit D in that case entitled *Exeter-West Greenwich Regional School District v. Exeter-West Greenwich Teachers' Association et al.,* C.A. No. WC 84–345."

The district's motions for a stay filed in the Superior Court and this court were

---

1. The commissioner sought mandamus relief in the Supreme Court in No. 84–437–M.P. to compel the regional school district to call an additional financial town meeting. This relief was denied because of the fragmented condition of the case and the fact that other litigation was pending addressing the issues.

denied. The committee then voted to implement the salary scale in the arbitrator's award pending a resolution of the questions before the court. School opened September 17, 1984. The appeal from the Superior Court's order of September 13 is before this court as No. 84–444–Appeal.

Because of the importance of the issues involved in these cases and the effect their resolution will have on all communities in the state, hearing on these cases has been accelerated and briefs from amicus curiae and intervenors have been permitted. Briefs by or on behalf of the Rhode Island Federation of Teachers, the towns of Exeter, West Greenwich, and North Kingstown, the Rhode Island League of Cities and Towns, the Commissioner of Education, and briefs of the several parties to the various actions have been examined. They have been informative and helpful to the court.

■ The Rhode Island League of Cities and Towns urges that the somewhat unorthodox travel of the declaratory-judgment action and the lack, at this time, of a final determination below on the validity of the arbitration award should make this court reluctant to decide the difficult issues before us. It is true that the travel of some of these cases raises substantial procedural questions; however, we are of the opinion that because the special circumstances presented here affect matters of grave public policy and interest, our consideration is warranted. For these reasons, we shall waive the procedural and jurisdictional questions that otherwise might prevent our review. *See Norton v. Paolino*, 113 R.I. 728, 327 A.2d 275 (1974); *Calore Rigging Corp. v. Sterling Engineering & Construction Co.*, 105 R.I. 150, 250 A.2d 365 (1969); *O'Brien v. Costello*, 100 R.I. 422, 216 A.2d 694 (1966).

■ Although the questions presented vary in each case, one central issue pervades the entire controversy, the resolution of which will virtually be dispositive of all the cases. That issue is whether a municipality or a regional school-district financial meeting can alter or evade valid contractual obligations by refusing to incorporate those obligations into its budget. This is our first opportunity to address this question directly. Having considered the records in the several cases before us and the various arguments presented, we conclude that such obligations are binding and must be funded.

The right to an education in Rhode Island is recognized and guaranteed in article XII, section 1, of the Rhode Island Constitution.

"The diffusion of knowledge, as well as of virtue, among the people, being essential to the preservation of their rights and liberties, it shall be the duty of the general assembly to promote public schools, and to adopt all means which they may deem necessary and proper to secure to the people the advantages and opportunities of education."

The Legislature delegated this responsibility to the school committees of the various cities and towns. Section 16–2–2.

"Except as herein otherwise specifically provided, every town shall establish and maintain for at least one hundred eighty (180) days annually exclusive of holidays a sufficient number of schools in convenient places under the control and management of the school committee and under the supervision of the board of regents for education."

The Legislature has also enacted the School Teachers' Arbitration Act, so-called, G.L.1956 (1979 Reenactment) § 28–9.3–1, and has authorized teachers to organize and bargain collectively, § 28–9.3–2, as amended by P.L.1981, ch. 418, § 1, and has imposed upon school committees the obligation to bargain in good faith and to submit to binding arbitration any grievances arising out of labor disputes. Section 28–9.3–4. This court has said:

"[T]he Legislature declared in plain and unequivocal language that it is the public policy of this state for certified public school teachers to organize, to be repre-

sented by an association or labor organization and to bargain collectively concerning hours, working conditions and 'other terms of professional employment.' " *Providence Teachers Union, Local 958, American Federation of Teachers, AFL–CIO v. School Committee of Providence*, 108 R.I. 444, 448, 276 A.2d 762, 765 (1971).

It is essential that we first consider the nature of the obligation or the relationship that existed between the school committee and the teachers when these events began. The parties had submitted to arbitration under § 28–9.3–9. After hearings, an award was issued by a majority of the panel in November 1983 that contained provisions for a three-step pay raise (one step each year for three years), Delta Dental benefits for the teachers, an increase in class size, and numerous other provisions concerning the entire working relationship between the teachers and the committee.

On March 6, 1984, after the financial meeting had reduced the proposed budget, the school committee's attorney advised that once the school committee honored any part of the arbitrator's award, such as the dental plan, the committee would be bound by that award. He also advised the committee that if it did not intend to honor the award, it should not lead the teachers into believing that the committee was accepting the award. Notwithstanding counsel's advice, the committee failed to notify the teachers that it would not honor the award and instead paid for the dental-plan coverage for the year, implemented the first-year salary increase, availed itself of the increased class size, and implemented some of the grievance procedures. In effect, it implemented everything but the second of the three-step salary increase.

■ In view of this action on the part of the committee, we have no difficulty in finding that the committee accepted the award. The committee therefore is estopped from challenging any aspect of the award because it was bound in the same manner as it would have been by an executed contract.

■ The next element we must resolve is the relationship that a school committee has with the town or district that it serves. This court had occasion to address this question many years ago in *Hardy v. Lee*, 36 R.I. 302, 90 A. 383 (1914). In that case, a teacher had petitioned for a writ of mandamus against the city of Cranston to require it to pay the remainder of her salary. The court held that the right of the teacher to collect her salary arose out of "a contract which the city has entered into through its properly authorized committee and as such it must be recognized and carried out." *Id.* at 307, 90 A. at 385. Consequently, it is clear that the committee's authority to contract carries with it the concomitant authority to bind the municipality it serves. The school committee therefore binds the municipality it serves by the valid contracts into which it enters. In *Providence Teachers' Union*, this court stated unequivocally that contractual obligations of a school committee are not voided by the existence of insufficient appropriations. 108 R.I. at 452, 276 A.2d at 767. Although the facts in that case differ substantially from this litigation, the principle enunciated by the court is fully applicable. Having concluded that there was a binding contract between the school committee and the teachers, and having concluded that the committee, by its actions, bound the towns of Exeter and West Greenwich under that contract, we now consider the principal issues before us.

The school committee and the towns of Exeter and West Greenwich argue that because the appropriating authority is a body distinct from the school committee, any contracts with the teachers or others are subject to the appropriating authority of the district financial meeting, and such contracts may be implemented only to the extent they are funded by the district financial meeting. They argue that the appropriating body has absolute authority in fiscal matters. That argument not only is

incorrect but could also lead to chaos in the public school system.

The precise question before us was present in the case of *Town of Scituate v. Scituate Teachers' Association*, 110 R.I. 679, 296 A.2d 466 (1972). There the issue became moot by the time the case came before the Supreme Court for final consideration. In that case, the school committee and the union had agreed upon teacher-salary increases that had not been funded by the financial town meeting. The school committee brought suit, seeking relief from the agreement with the union on the theory that the collective-bargaining agreement was no longer binding on the town because the financial meeting had not appropriated sufficient funds. The trial justice had ruled that

> "[t]he collective bargaining process contemplated by the School Teachers' Arbitration Act would be useless if the body charged with appropriating funds were free to ignore the existence of a valid agreement fairly reached at the bargaining table by the school committee and the bargaining agent." *Id.* at 682–83, 296 A.2d at 468.

After this ruling and denial of declaratory relief without prejudice by the trial judge, another financial town meeting was held at which the additional funds needed to pay the salary increase was appropriated. Thus, we did not have the opportunity to pass on the central issue in that case.

We recognize that some states, such as New York and Pennsylvania, have provided explicitly by statute that collective-bargaining salary agreements are of no force until they are funded by the appropriating authority.[2] The State of Connecticut, on the other hand, specifically provides that the appropriating authority must fund collective-bargaining agreements entered into by school committees.[3] In Rhode Island, however, we must read and construe several statutes in order to determine the binding effect of collective-bargaining agreements with public employees. As the court observed in *Providence Teachers' Union*, "If this court is to effectuate this legislative purpose, we cannot look [to one act or another] in a vacuum." 108 R.I. at 448, 276 A.2d at 765. We shall "look at other * * * legislation that is in *pari materia* with the Act before us. Statutes which are not inconsistent with one another and which relate to the same subject matter * * should be considered together so that they will harmonize with each other and be consistent with their general object and scope * * *." *Id.* at 449, 276 A.2d at 765.

The Michaelson Act, or the School Teachers' Arbitration Act, so-called, § 28–9.3–1, gives to public school teachers the right to bargain collectively. Section 28–9.3–2 provides in part:

> "The certified teachers in the public school system in any city, town or regional school district, shall have the right to negotiate professionally and to bargain collectively with their respective school committees * * * concerning hours, salary, working conditions and all other terms and conditions of professional employment."

Section 28–9.3–4 provides in part

> "It shall be the obligation of the school committee to meet and confer in good faith * * * [T]he duty to cause any agreement * * * to be reduced to a written contract, provided that no such contract shall exceed the term of three (3) years."

Section 28–9.3–8 is of particular interest because it contemplates contracts entered into by school committees and funded by other separate governmental bodies. Section 28–9.3–8 provides that

> "Whenever salary or other matters requiring appropriation of money by any

---

2. N.Y.Civ.Serv.Law § 204-a(1) (McKinney 1965); Pa.Stat.Ann. tit. 43, § 1101.901 (Purdon Supp.1984–85). *See also Philadelphia Federation of Teachers, Local No. 3 v. Thomas,* 62 Pa. Commw. 286, 436 A.2d 1228 (1981).

3. Conn.Gen.Stat.Ann. § 7–474(C) (West Supp. 1984).

city, town or regional school district are * * * [a] matter of * * * collective bargaining conducted under the provisions of this chapter, the [teachers' agent] must first serve written notice of request for * * * collective bargaining on the school committee at least one hundred twenty (120) days before the last day on which money can be appropriated by the city or town to cover the first year of the contract period which is the subject of the negotiating or bargaining procedure."

The reason for this advance notice of 120 days is crystal clear. It is intended to allow the town or city to prepare and fund an adequate budget to meet the obligations incurred by the school committee.

In 1980, in response to the problem of deficit spending by local school committees, the Legislature enacted P.L.1980, ch. 152, commonly known as the Lamb Act after one of its principal sponsors. The school committee argues that the enactment of the Lamb Act has negated the holdings in *Providence Teachers' Union* and *Town of Scituate,* both *supra.* That is clearly not the case. The section of that act of particular interest to this discussion is § 16–3–11(n), which in its original language read:

"Provided, however, that such expenditures, encumbrances and accruals shall not in any fiscal year exceed the total revenue belonging to the district. Should the treasurer estimate that *actual expenses may exceed* total available revenue in any fiscal year, he shall so notify the school committee and the superintendent of schools, and the chief elected officials of the towns. Purchase orders or financial commitments shall *not be authorized* even on the order of the school committee unless it can be proven that there will not be an excess of expenditures, encumbrances and accruals over revenues." (Emphasis added.)

However, in 1981 the General Assembly amended § 16–3–11(n) in P.L.1981, ch. 397, § 1, by adding the following sentence:

"Nothing contained herein shall be construed so as to prohibit a school committee from negotiating and contracting with school employees and teachers for services to be rendered in the ensuing fiscal years pursuant to chapters 28–9.3 and 28–9.4."

As we have noted earlier, chapters 28–9.3 and 28–9.4 are entitled "Arbitration of School Teacher Disputes" and "Arbitration of Municipal Employees' Disputes," both of which chapters mandate collective bargaining. The Legislature clearly intended, by this amendment, to provide that collective-bargaining agreements would be honored regardless of the earlier provisions of § 16–3–11(n) since § 28–9.3–4 provides that collective-bargaining agreements may extend to a term of three years. When we read this section in conjunction with § 16–2–9(a) regarding employment contracts, which states unequivocally that it is "in the interest of public policy that the school committees of each city, town, or regional school district shall have the power to bind their successors and successor committees by entering into contracts of employment in the exercise of their governmental functions," there is no question that the Legislature intended these contracts and obligations to be binding and enforceable once they are validly entered into.

 If school committees are authorized by law to enter into binding agreements, which they are, then the community is bound to fund that agreement through its appropriating authority, whether that authority is the city or town council, a financial town meeting, or a district financial meeting. To conclude otherwise would completely negate the statutory power of the school committee to bargain and contract; this would mean that the Legislature has given with one hand and taken away with the other. We will "not ascribe to the Legislature an intent to enact legislation that is devoid of any purpose, is inefficacious, or is nugatory." *Cocchini v. City of Providence,* R.I., 479 A.2d 108, 111 (1984) (citing *Kingsley v. Miller,* 120 R.I. 372, 388 A.2d 357 (1978)).

██ Therefore, we hold that a city or town is bound by and must fund the valid collective-bargaining agreements entered into by its school committee as well as other obligations incurred in the providing of services mandated by law.

██ To those who assert that we are upsetting the political balance between a school committee's authority to contract and the town or city council's or financial town meeting's authority to appropriate, we answer that this is not a situation created by the courts. The Constitution and the Legislature in its several enactments over the years have erected a structure of laws that we are under a duty to read together and interpret. Having done so, we have come to the conclusion and we emphasize that budgets submitted by school committees to the appropriating authority to fund collective-bargaining agreements and to fund mandated programs and services must be funded.

Our problems are not unique. Other states whose statutes are similar in concept to ours have reached the same conclusion. In *Sullivan v. Flynn,* 116 N.H. 547, 365 A.2d 1052 (1976), the Supreme Court of New Hampshire held that the Mayor of Nashua and board of aldermen were obligated to appropriate to the local school board the funds that the school board deemed necessary to finance its budget, including sums in excess of total appropriations. In so holding, the court said:

"This conclusion does not upset the political decision-making process in Nashua. The board of education, charged with the fiscal management of the schools, is composed of nine members elected at large by the voters of Nashua. * * * There is no guarantee that the will of the people will be more effectively voiced through the mayor and aldermen than through the board of education. Nor is there any suggestion that the members of the board are insensitive to the 'kind of education the district wants to buy.' * * * Spending decisions of the school board necessarily come under pub-

lic scrutiny and the city charter adequately provides the voters of Nashua with political control over those decisions." *Id.* at 551, 365 A.2d at 1055.

More recently, in *Boston Teachers Union, Local 66 v. School Committee of Boston,* 386 Mass. 197, 434 N.E.2d 1258 (1982), the Supreme Judicial Court of Massachusetts held that the city council of Boston and the Mayor were obligated to appropriate to its school committee the funds necessary to pay salary increases provided in collective-bargaining agreements, notwithstanding the absence of an appropriation by the city council to fund the increases. The court disagreed with the argument that to require such an appropriation would upset the political balance between the school committee and the city council, reasoning that

"The discretion of the city council in appropriating funds in addition to those appropriated * * * is no more affected than the discretion of any other legislative body in funding salary increases * *. Nor is there any inconsistency with the Legislature's statutory limit on the Boston school committee's appropriation power. It is the collective bargaining agreement that mandates the appropriation, not the school committee, and the city council retains its power, in the first year of the agreement, to reject the collective bargaining agreement and refuse to make the appropriations." *Id.* at 209–10, 434 N.E.2d at 1266.

Several years ago, Justice Joslin in *Town of Scituate, supra,* invited the attention of the Legislature to make clear whether and to what extent a school committee could bind a municipality to financial commitments for school purposes that could not be satisfied from appropriated funds. Since the Legislature has not responded, it has become our obligation to do so.

██ For these reasons, in No. 84–461–M.P., we find no error in the decisions of the Board of Regents for Education that affirmed the decisions of the Commissioner of Education. Those decisions are af-

firmed. Since those decisions must be enforced by recourse to the Superior Court in accordance with the provisions of G.L.1956 (1976 Reenactment) § 16–39–3.1 governing enforcement of final decisions, we remand those cases to the Superior Court for entry of judgment forthwith in the amount of $325,000. Thereafter, that judgment shall constitute a debt against the towns of Exeter and West Greenwich that shall be enforceable by order of the Superior Court against the tax assessors of Exeter and West Greenwich in accordance with the provisions of G.L.1956 (1980 Reenactment) §§ 45–15–6 and 45–15–7. The Superior Court will order the assessors of the two towns to assess the ratable property of the towns in proportion to their financial obligation to the regional school district and the tax collectors, or other appropriate officials, are ordered to collect a tax sufficient for the payment of said judgment into the account of the regional school-committee treasurer or principal fiscal officer with all incidental costs, charges, and expenses of the assessors in collecting said tax. The Superior Court could, at any time, terminate these proceedings for the satisfaction of the debt on notification of the parties that the deficit had been funded by action of the district financial meeting and of the towns of Exeter and West Greenwich.

In No. 84–442–M.P., the petition for certiorari to review the granting of a conditional preliminary injunction, for the reasons discussed above, we find error in applying the equitable doctrine of unclean hands in this school strike situation. The school committee was entitled to an unconditional injunction against the illegal strike. Therefore, we vacate the condition placed upon the injunction entered and remand the papers in that case to the Superior Court with our opinion endorsed thereon.

In No. 84–444–Appeal, we find no error in the granting of the mandatory injunction against the school committee. The appeal of the school committee is therefore denied and dismissed, the judgment entered by the Superior Court is affirmed, and the papers of that case are remanded to the Superior Court for further proceedings.