[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
This matter is before the Court as a result of the filing of a complaint by the plaintiff Cranston School Committee (hereinafter "School Committee") against the City of Cranston (hereinafter "City"), the members of the Cranston City Council (hereinafter "City Council"), Mayor Stephen P. Laffey, the Finance Director, Tax Assessor and Treasurer of the City of Cranston.
This complaint was filed pursuant to R.I.G.L. § 16-2-21.4, commonly referred to as the Caruolo Act. Subsection (b) of the Act mandates that these actions shall be accorded priority and shall be decided on an expedited basis. The parties, with the assistance of the Court, established expedited discovery procedures which attempted to balance the significant volume of potential discovery material with the need to commence the hearing of this matter at the earliest opportunity.
R.I.G.L. § 16-2-21.4 requires that a school committee seeking additional funding from the appropriating authority must first satisfy certain prerequisites before commencing litigation.[1] First, the school committee must adhere to the budget that has been appropriated.[2] Second, the school committee is required to petition the Commissioner of Education in writing to seek alternatives and/or waivers to state regulations that would allow the school committee to operate with a balanced budget.[3] Third, if the alternatives and/or requests for waivers are denied, the school committee may request that the city council reconsider whether to increase the appropriation for schools to meet expenditures.[4]
If the efforts outlined above fail to conform the school budget to the existing appropriation or fail to increase the appropriation sought by the school committee, an action may be filed in the Superior Court in Providence County where "the ultimate decision-making power with respect to school budget disputes will be vested in the Superior Court. . . ." Beil v.Chariho School Committee, 667 A.2d 1259 (R.I. 1995).
 Background
On March 1, 2003, the School Committee submitted a budget request to the City in the amount of $110,338,382. In response, the City recommended an appropriation in the amount of $104,546,346 to the School Department ("Department"). After several additional adjustments, including an additional $1,032,253 in state aid, the total appropriation for the Cranston public school system for fiscal year 2003-04 was $105,718,285.
The School Committee's response to this appropriation was to reduce its budget to $108,919,055 rather than adjust its budget to the actual appropriation as required by state law.
After an unsuccessful attempt to obtain alternatives and/or waivers from the Commissioner of Education and the refusal of the City Council to increase the appropriation, the School Committee, under the threat of a writ of mandamus sought by the City, made numerous cuts to its budget to reach the appropriated amount of $105,718,285. The most controversial budget cut was the elimination of funds for extra-curricular activities, including music, art and sports programs as of November 1, 2003.[5]
In September 2003, the School Committee instituted this action pursuant to § 16-2-21.4 seeking an additional appropriation in the amount of $3,200,770.
 Applicable Law
In considering a request for an additional appropriation, the School Committee "shall be required to demonstrate that [it] lacks the ability to adequately run the schools for that school year with a balanced budget within the previously authorized appropriation. . . ." § 16-2-21.4 (b).
This Court is in agreement with the views espoused in two cases that have interpreted R.I.G.L. § 16-2-21.4 wherein the court found that the clear mandate of this statute requires a trial on the merits of the controversy with the School Committee having the burden of establishing its claim for an additional appropriation by a preponderance of the evidence. See CoventrySchool Committee v. Coventry Town Council, 1996 WL 936874 (R.I.Super.) and Exeter-West Greenwich Regional District v. Town ofExeter and Town of West Greenwich, 1996 WL 936929 (R.I.Super.).
This Court also adopts the position expressed in CoventrySchool Committee which found that state law requires that a municipality appropriate to a School Committee an amount, together with state and federal aid (and other revenues), that is not less than the costs of the basic education plan (§ 16-7-24), state or federally mandated programs, and costs of collective bargaining and other lawfully incurred obligations. See ExeterWest Greenwich Regional School District v. Exeter-West GreenwichTeachers' Association, 489 A.2d 1010 (R.I. 1985). Further, this Court finds no authority in state law or specifically in §16-2-21.4 supporting the establishment of a contingency fund or other form of retained earnings as a distinct budget line item, or that "padding" of a school budget is an appropriate consideration in determining adequate funding for a school system. See Exeter-West Greenwich Regional District.
Lastly, the parties have stipulated, with the Court's concurrence, that the City's fiscal condition, or ability to fund an additional appropriation, is not a consideration under §16-2-21.4.
 Findings of Fact
The hearing in this matter commenced on October 10, 2003, and concluded on January 23, 2004. The Court heard testimony from six witnesses: Superintendent Catherine Ciarlo, Dennis Neri, Joseph Balducci, Kevin D. Walsh, Walter Edge and Thomas Sweeney and received and reviewed 120 exhibits.
After careful consideration of the entire record in this matter, the Court makes the following findings of fact:
 1. Superintendent Ciarlo has been employed by the Cranston School Department for 43 years holding the position of classroom teacher, reading instructor, assessment program director, BEP coordinator, assistant director of curriculum, assistant superintendent and since July 1, 1997, superintendent.
 2. The Cranston public school system presently consists of 19 elementary schools, 3 middle schools, 2 high schools, one career and technical school affiliated with a high school, and one charter school.
 3. The Cranston public school system is the third largest in the state with 11,222 students.
 4. The Rhode Island Public Expenditure Council's report on Education in Rhode Island-2003 ranks Cranston 27th out of 36 districts regarding per pupil expenditures and in the "urban ring" communities as designated by the Commissioner of Education, Cranston is ranked lowest behind districts in East Providence, North Providence, Warwick and West Warwick. See
Exhibit 12.
 5. In 2003, the State Department of Education ranked 11 Cranston schools as high performing, 10 as moderate performing and 2 as low performing.
 6. The School Department has operated a self-insured medical and dental plan for its employees since 1991. Kevin D. Walsh, a health care consultant, is retained by the School Department to calculate yearly health and dental care cost projections for inclusion in the Department's budget proposals.
 7. The record contains three different projections regarding adequacy of funds allocated for health and dental care costs for fiscal year 2003-04. These projections were made between November 14 and November 20, 2003. In less than one week, Mr. Walsh's projection fluctuated from a surplus of $2,040,965, to a lower surplus of $1,372,758, to a deficit of $149,508 in the School Department's group health and dental program for this year.
 8. Mr. Walsh admitted that the deficit projection in the amount of $149,508 was based upon a "weighted analysis" methodology which is not generally utilized but was requested by the School Department.
 9. Mr. Walsh's testimony and report projecting a deficit in the health and dental costs for fiscal year 2003-04 is inherently inconsistent, unreliable, highly suspect and is rejected by the Court.
 10. Based upon a review of all of the evidence related to the group health and dental care program, this Court is unable to accept any of Mr. Walsh's projections.
 11. This Court finds the $1,040,000 allocated for purchase of "texts, supplies, and other materials" for fiscal year 2005 is unjustified and the need for these funds in fiscal year 2003-04 has not been established.[6]
 12. This Court accepts Mr. Sweeney's opinion, based upon his experience as a former superintendent for twelve years, that most school systems do not purchase texts, supplies and materials in advance. He indicated that the School Department could order these items after the start of the fiscal year for the upcoming school year without concern for delay or unavailability of these items for the opening of school.
 13. This Court rejects the School Department's position that this $1,040,000 advance purchase of these items is vital to the operation of the school system. The Department's staunch devotion to this purchase practice and their refusal to consider any alternatives revolved around concerns related to timely delivery, accountability, and possible violation of state law or the teacher's collective bargaining agreement. These assertions are not supported in the record and there is little corroborating evidence to bolster the testimony of Superintendent Ciarlo and Mr. Balducci on this issue.
 14. The testimony provided by the City's witnesses, Walter Edge and Thomas Sweeney,[7] was detailed, cohesive and persuasive.
 15. This Court finds the preferred approach typically utilized by Mr. Edge in addressing issues in a Caruolo action was thwarted by the School Department's obvious reluctance to share historical data, by failing to provide prompt responses regarding year-to-date budget expenditures, and by its insistence that all information be requested by written interrogatories and all responses provided in writing. Mr. Edge stated that the inability to meet face-to-face in the discovery phase made his task more difficult and more time consuming.
 16. Notwithstanding the difficulties experienced in discovery, the Court accepts and finds Mr. Edge's examination of the School Department budget to be sound and within the narrow legal framework required by § 16-2-21.4.[8]
 17. Mr. Edge and Mr. Sweeney found numerous deficiencies in the School Department's budget process, in the accuracy of many line items, and identified many areas of discretionary spending within the budget.
 18. This Court adopts the budget adjustments set forth in Exhibit X. Mr. Edge recognized add-backs to the School Department's budget request in 8 categories that totaled $1,642,719. He also recognized reductions in 23 items within the budget for a total deduction of $5,407,707. When these additions and deductions are applied to the $108,919,055 appropriation requested by the School Department, the appropriation required to adequately fund the school system is $105,154,067, or $564,218 less than what has been appropriated for fiscal year 2003-04.
 19. This Court accepts the testimony of Mr. Edge and Mr. Sweeney as it relates to all budget matters contained in Exhibit X and their opinion that there is $564,218 in excess funding in the School Department's budget for fiscal year 2003-04.
 20. Based upon this Court's finding that there are excess funds in the amount of $564,218, this Court denies the School Department's request for reimbursement of the cost of the performance audit required pursuant to § 16-2-21.4, and further finds its request for any funds relating to the Auditor General's deficit reduction plan is beyond the authority conferred by § 16-2-21.4.
 Conclusion
This budget controversy comes before this Court after a long and contentious struggle between the School Department and the City Council. The subject matter and nature of this dispute, however, is not unique to the City of Cranston.
 "School finance is an inherently controversial issue in the United States because it affects two basic issues that concern most American voters: the resources available for their children's education and their state and local taxes. . . . There is no consensus about the quality of education to which every child is entitled, the extent to which each citizen should pay for that education, or the level or forms of disparities that are acceptable within a school district, state, or the nation."[9]
It has been further observed:
 "Societies are under almost constant pressure to expand and improve their social services, and the increased demand for education is no different. In the past, higher spending on schools usually produced demonstrably more education — a new high school system, an extension of vocational education, more available kindergartens, more and better paid staff, and presumably a better educated population. Today, however, the relationship between more resources and higher pupil achievement is less clear, threatening the basis for public support for schools and the credibility of public finance research in the field. . . . It is now even popular to claim that `money doesn't matter in education, or more precisely, that more money does not produce better results.'"[10]
It has also been noted that "there is little historic evidence that changes in educational investment have been matched by changes in student performance."[11]
This Court is mindful of the vital importance of education in the lives of our children and that a well-educated citizenry is the cornerstone of our democracy. Yet, the admirable quest to create high-performing schools and students is not a matter of funding alone.
 "The central issue in all policy discussions is usually not whether to spend more or less on school resources but how to get the most out of marginal expenditures. Nobody would advocate zero spending on schooling, as nobody would argue for infinite spending on schooling. The issue is getting productive uses from current and added spending. The existing evidence simply indicates that the typical school system today does not use resources well (at least if promoting student achievement is their purpose)."[12]
The sole inquiry pursuant to § 16-2-21.4 is whether there is adequate funding for the operation of Cranston public schools for the year 2003-04. The School Department has fallen woefully short of meeting its burden that an additional appropriation of $3,200,770 is necessary for this school year.
The thrust of the School Department's case focused upon the needs and requirements of what it believed a quality school system required. There was significant emphasis on information related to how the statewide salary ranking of Cranston teachers has recently declined, how some of its schools are not high performing, and how state and federal programs, most notably the No Child Left Behind Act, necessitate additional funding. This argument was previously rejected in Coventry School Committee
which observed:
 "An argument has been made that our law requires that the appropriating authority (here the Town) must provide and fund a quality education. This Court has sought a definition of that term or in the alternative precedential guidance as to what quality is required. Finding none this Court holds that (for purposes of this litigation) quality education must be that education which complies with the BEP and mandated federal and state programs. Of course, an appropriating authority may provide and fund a more enriching or wider program, but to the extent that it chooses to do so is a political rather than a legal decision." 1996 WL 936874 at 11.
Teacher salary rankings are not relevant under the adequate funding standard contained in § 16-2-21.4. Student and school performance measures are arguably relevant if a correlation was established between the additional funds sought and how those funds would be allocated in order to achieve the results required by the state and federal programs. The record is devoid of reference as to where these funds would be allocated or how additional funding would achieve the performance standards required by these programs. The School Department failed to provide any historical or current data that establishes a correlation between the additional $3,200,770 sought and its ability to operate the school system. The City, on the other hand, presented expert testimony which was highly detailed and supported by historical budget data that was correlated to specific line items demonstrating that the City's appropriation is more than adequate to operate the school system in all respects in fiscal year 2003-04.
Having failed to prove its case by a preponderance of the evidence, this Court is constrained to deny the School Department's request for an additional appropriation. The greater weight of the evidence in the record establishes that the Cranston public school system is adequately funded by the City in the amount of $105,718,285, and this appropriation will permit the School Committee to operate with a balanced budget in fiscal year 2003-04.
[1] Prior to enactment of R.I.G.L. § 16-2-21.4, school budget disputes were treated as administrative appeals to the Commissioner of Education.
[2] The parties were engaged in litigation immediately preceding this matter wherein the school committee refused to conform its budget to the amount the City Council had appropriated in clear violation of state law. With the court's decision looming regarding the City's request for a writ of mandamus, the school committee finally relented and made the cuts necessary to align their budget with the City's appropriation.
[3] It is obvious to the court that this statutory requirement was barely satisfied and is best described as a perfunctory, half-hearted exercise by the school committee that they knew would be rejected in all respects by the Commissioner. See
Exhibit 8. This Court likewise finds that the Commissioner's reply to the request for waivers completely disregards the statutory mandate that "the commissioner must consider alternatives for districts to comply with regulations and/or provide waivers to regulations in order that the school committee may operate with a balanced budget. . . ." See Exhibit 9.
[4] The school committee requested a reconsideration of increased school funding on September 8, 2003. See Exhibit 10. A response was never received from the City Council.
[5] Prior to the commencement of the hearing in this matter and after considerable public protest, the parties agreed to an order continuing these extra-curricular activities for the remainder of the school year. It is further noted with interest that there was no public protest regarding the simultaneous cuts made for the purchase of textbooks and materials. Superintendent Ciarlo testified, in response to an inquiry by the Court, that in her many years of experience she had never witnessed a public protest to budget cuts relating to the purchase of these essential educational items.
[6] The Court notes that during cross-examination Superintendent Ciarlo and other School Department witnesses stated that this line item was actually apportioned 75% for next year's purchases and 25% for emergency purchases in the current school year. No credible evidence was provided to the Court to identify any emergency purchases of this magnitude historically or in the current year.
[7] The parties stipulated to Mr. Edge's expertise in the field of school finance and auditing and Mr. Sweeney's expertise in school administration.
[8] It is noted with approval that Mr. Edge understood the parameters of his examination when he stated that he did not make value judgments about programs but rather conducted an examination of how much money is needed to get through this year.
[9] Carr, Melissa C., Fuhrman, Susan H., The Politics ofSchool Finance in the 1990s, in EQUITY AND ADEQUACY IN EDUCATION FINANCE: ISSUES AND PERSPECTIVES 136, 136-37 (Heler F. Ladd, Rosemary Chalk Janet S. Hansen eds., 1999).
[10] Cooper, Bruce S., et al., Making Money Matter inEducation: A Micro-Financial Model for Determining School LevelAllocations, Efficiency, and Productivity, 20 J. EDUC. FIN. 66,67 (Summer 1994).
[11] Hess, Frederick M. Courting Backlash: The Risks ofEmphasizing Input Equity over School Performance, 6 VA. J. SOC. POL'Y L 11, 17 (Fall 1998).
[12] Hanushek, Eric A. School Resources and StudentPerformance, in DOES MONEY MATTER? 69 (Gary Burtless ed., Brooking Institution Press 1996).