[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
The action before this Court was commenced by the Johnston School Committee ("School Committee') and Margaret Iacovelli, in her capacity as the Superintendent of Schools for the Town of Johnston ("Superintendent") (hereafter collectively referred to as "Plaintiffs" or the "School Committee"). The Defendants are the members of the Johnston Town Council, as well as the Mayor and Finance Director of the Town (hereinafter collectively referred to as the "Defendants" or the "Town"). This action represents the culmination of the budget process for funding of the operation of the public school system for the Town of Johnston for the fiscal year 2004-05.
The Plaintiffs have filed this action pursuant to title 16, chapter 2, section 21.4 of the Rhode Island General Laws, a statute commonly referred to as the "Caruolo Act," alleging that the School Committee lacks the ability to operate the Johnston schools for the 2004-05 school year with the funds appropriated by the Town, in that it will be unable to comply with the mandates of law, regulation, and binding contractual obligations if its spending is limited to the appropriated funds. Accordingly, in conjunction with the provisions of Gen. Laws 1956, §16-2-21.4, the Amended Complaint seeks an order from this Court compelling the Defendants to increase the appropriation to the Johnston School Department for the 2004-05 school year.
The Defendants, on the other hand, argue that the Plaintiffs have failed to properly invoke the jurisdiction of this Court under the applicable statute, and that even if the Court's jurisdiction is exercised, the Plaintiffs have failed in their burden of proving that the additional funding is necessary for the Johnston School Department to meet the requirements of law, regulation and contract.
 THE CARUOLO ACT
The procedure for resolving school financing disputes in Rhode Island is a creature of statute. The process has evolved over the years, and the ultimate fact-finder has shifted from the Commissioner of Education to the Superior Court. The theater of school finance, in accordance with §16-2-21.4, has become a five act play, with at least one curtain call. The components are as follows:
1. In accordance with Gen. Laws 1956 § 16-2-21, a "pre-budget" consultation process is established, wherein the school committee and the town council are required to meet and confer so that each side understands the revenue projections of the town, and the anticipated expenditures of the schools.
2. If the school committee determines that the budget ultimately approved by the town council is an amount which, together with state education aid and federal aid, is insufficient to carry out its contractual commitments, as well as basic mandates under state and federal law and regulation, it must nevertheless adhere to the appropriated budget and bring its spending in line with the amount appropriated.
3. The chairperson of the school committee, in accordance with Gen. Laws 1956 § 16-2-9, must then petition the State Commissioner of Education to seek alternatives for the district to comply with state regulations and/or provide waivers to state regulations that would allow the district to operate with a balanced budget.[1]
4. If the Commissioner does not approve the alternatives and/or waivers, the school committee may request that the town council increase the appropriation to meet the required expenditures.
5. In the event the town council refuses to provide additional appropriations, the school committee may bring an action in this Court, and if it demonstrates that the school committee lacks the ability to operate the schools for that school year within the amount appropriated in a manner consistent with its obligations under law, regulation and contract, this Court may order an additional appropriation from the town to enable it to do so.[2]
6. Upon the bringing of an action in Superior Court, the Mayor shall cause to have a financial and program audit of the school department conducted either by the Auditor General or by an independent public accounting firm.
 JURISDICTION
The Defendants have made three initial challenges to the jurisdiction of this Court.[3] First, the Town argues that the School Committee failed to adhere to the Town's reduced budget appropriation. Second, the Town claims that the School Committee failed to follow the proper procedure in their petition to the Commissioner of Education for alternatives and/or waivers of state regulations. Third, the Defendants argue that the Town Council, as the appropriating authority, never issued a "negative vote" on the final request from the School Committee to increase the Johnston School Department appropriation, thus rendering the attempt to invoke the jurisdiction of this Court premature. The Court will consider each of the Town's arguments of procedural error.
A. Failure to adhere to a reduced budget
Section 16-2-21.4(a), provides, in pertinent part:
 "(a) Notwithstanding any provision of the general or public laws to the contrary, whenever a city, town, or regional school committee determines that its budget is insufficient to comply with the provisions of § 16-2-21, 16-7-23, or 16-7-24, the city, town, or regional school committee shall adhere to the appropriated budget or the provisions of § 16-2-23 in the absence of an appropriated budget . . ." Section 16-2-21.4(a).
In addition, state law prohibits a school committee from running a deficit budget. See Gen. Laws 1956 § 16-2-18 (providing, in part, that in no fiscal year shall a deficit be permitted for school operations).
In this instance, when the Town initially appropriated a budget amount for the Johnston School Department, which was $2,080,181 short of the requested appropriation, the School Committee passed a resolution on July 27, 2004, which reduced the spending authorization for the fiscal year 2004-05 to the amount of the Town's appropriation, $39,722,144. (Pls.' Ex. 7). Thereafter, the School Committee engaged the services of Messrs. Sweeney and Edge of the consulting firm of B E Consulting LLC ("B 
E"). With their assistance, a thorough review of proposed school expenditures was initiated to determine whether each line item in the proposed budget was necessary in order for the Johnston public schools to comply with state and federal law and regulation, the State's "Basic Education Program for Rhode Island Public Schools" (the "BEP"),[4] and contracts which were legally binding on the School Committee. After the School Committee, with the assistance of their consultants, determined that the reduced budget amount was insufficient to allow the School Committee to complete the 2004-05 school year, on December 14, 2004, the School Committee resolved that, at the recommendation of the Superintendent, the budget be increased to the amount of $42,431,112 for the 2004-05 fiscal year. It is that increased budget resolution that allegedly puts the Plaintiffs out of compliance with the balanced budget requirements of state law in general, and the Caruolo Act in particular, thereby resulting in the Plaintiffs' failure to adhere to the jurisdictional prerequisites of § 16-2-21.4.
The evidence establishes that the School Committee acted consistent with § 16-2-24.1 immediately upon its having learned that the Town Council, as the appropriating authority, appropriated less money to the Johnston School Department then what the School Committee had determined was necessary for the 2004-05 school year. However, there came a time months after the commencement of the school year, after the School Committee had attempted to bring its spending in line with the appropriation, that a determination was made in consultation with outside experts, that the School Committee would be acting in violation of state and federal mandates, and in breach of its contractual commitments, if it slavishly limited its spending in line with the budget as appropriated by the Town. It was only at that time that the School Committee passed a subsequent resolution that cast its budget out of line with the Town's appropriation. While technically such a resolution may have run afoul of the express language of the statute, this Court cannot find that the December 14, 2004 resolution results in this Court's failure of jurisdiction.
The Court finds that the School Committee has effectively acted in a manner contemplated by both the words and substance of the Caruolo Act. Its immediate response to the Town's appropriation was a resolution reducing its budget to the appropriated sum. The School Committee then began the process contemplated by the Act to find ways to actually limit its spending consistent with the lowered budget. Only when the School Committee determined that continued adherence to the budgeted amount would jeopardize the legality of its actions under other state and federal laws did it pass another resolution increasing its budget. If the Defendants' argument were to be credited, the School Committee could never properly invoke the Caruolo Act provisions. The Act is only triggered once the School Committee determines that it will be acting contrary to law under the Town's budget. To literally require that it only spend consistent with that appropriation would suggest that the School Committee must act in violation of law before it can maintain jurisdiction to request that the Court recognize its preexisting legal obligations. Such an interpretation would lead to an absurd circularity that cannot have been contemplated by the Caruolo Act. See, e.g.,Cranston Teachers' Assoc. v. Cranston Sch. Comm., 424 A.2d 648, 650
(R.I. 1981) (noting that a literal reading of a statute should be abandoned if such a reading would lead to an absurd result or defeat an obvious legislative purpose) (citing Buffi v. Ferri, 106 R.I. 349, 353,259 A.2d 847, 850 (1969)). Accordingly, the Court finds that the Resolution adopted on December 14, 2004 does not deprive the Court of jurisdiction to hear the Plaintiffs' claims.
B. Petitions to the Commissioner
Section 16-2-21.4(a) provides in relevant part:
 "The chairperson of the city, town, or regional school committee, in accordance with the provisions of § 16-2-9, shall be required to petition the commissioner, in writing, to seek alternatives for the district to comply with state regulations and/or provide waivers to state regulations and, in particular, those which are more restrictive than federal regulations that allow the school committee to operate with a balanced budget." Section 16-2-21.4(a).
Jennifer Wood, the Chief Legal Counsel and Chief of Staff at the Department of Elementary and Secondary Education, testified generally about the waiver process and the practicalities of the process in light of the various provisions of state and federal law and regulation. Although the Caruolo Act requires that a school committee seek waivers and/or alternatives to state regulation that might reduce costs and thereby eliminate or ease the gap between an appropriation and necessary spending, in reality the universe of possible waivers that the Commissioner could consider is relatively narrow. For example, the Caruolo Act itself excludes any waivers "which affect the health and safety of students and staff" or which may be mandated by the special education provisions of title 16, chapter 24 of the General Laws. In addition, the Act constrains the Commissioner's discretion and precludes statutory, as opposed to purely regulatory, waivers.[5]
Waivers with regard to the requirements of the BEP are also problematic. The BEP is not a compilation of objective standards or minimum staff levels per pupil or program. Rather, with only a few exceptions,[6] the BEP is a compilation of minimum program requirements requiring subjective judgments under standards directing school departments to have programs that are "adequate," "efficient," or "effective."[7] These concepts are not readily susceptible to that required by the Caruolo Act — a request by a superintendent for waivers or compliance by alternative means. According to Ms. Wood, such limitations leave a very narrow purview of regulations for which waivers or alternatives may be granted.
In accordance with the mandate of the Caruolo Act, the Plaintiffs did request several waivers and/or alternatives from the Commissioner. By letter dated June 7, 2004, the Superintendent requested a waiver for the Family and Consumer Science Program at both the middle school and the high school. (Pls.' Ex. 5). In response, the Commissioner indicated that the requirements for consumer education and home economics had changed under the BEP, and acknowledged that the Superintendent's proposed program of having certain portions of the Family and Consumer Science Program subsumed in other courses would be a fair alternative to satisfy BEP requirements. Accordingly, a waiver was unnecessary. (Pls.' Ex. 6). A more comprehensive list of proposed waivers was forwarded by the Superintendent to the Commissioner on November 2, 2004, explaining the discrepancy between the Town's appropriation and the amount that the School Committee believed to be necessary to fulfill its contractual obligations, state and federal mandates, and the BEP. (Pls.' Ex. 9). The following three waivers were requested by the Superintendent:
 • Waiver of regulations relative to bussing of students other than those who are physically handicapped;
 • Waiver of the regulation that students be allowed to attend the Cranston Career and Technical School; and
 • Increase in minimum class size for special education students from ten to twelve before the requirement for a classroom aid is triggered.
The Superintendent noted that the School Committee did not believe that the requested waivers were in the best interest of the educational program in the Town, and that the requests were made "only to comply with existing state law." (Pls.' Ex. 9).
Within one week the Commissioner responded that none of the requested waivers would be granted because, in each instance, the Commissioner determined he lacked authority to issue the waiver, either because the request was to waive a statutory, as opposed to a regulatory requirement, or that the request was outside of the waiver authority under the Caruolo Act itself. (Pls.' Ex. 10).
Reluctant and superficial compliance with the Act's requirement that waivers and/or alternatives to state regulatory mandates be requested of the Commissioner seems to have become the standard operating procedure for school committees and superintendents prior to filing an action in Superior Court under the Caruolo Act.[8] The Court certainly does not condone perfunctory compliance or meaningless "base touching" in order to bootstrap jurisdiction in the Superior Court. It certainly appears that in this case, the November 2, 2004 letter to the Commissioner was "dead on arrival," as it requested waivers of items that the School Committee knew or should have known were beyond the purview of the Commissioner's authority. Yet, as the representative of the Commissioner's office testified, despite the intent of the Caruolo Act that the Commissioner play a meaningful part in attempting to close a gap that may exist between appropriations and budget requests, there are few items that can be waived in a manner resulting in a material cost reduction. Further, the Town failed to present any evidence that there were particular line items which, had they been the subject matter of a waiver and/or alternatives request, could have resulted in any significant savings.[9] Accordingly, the Court finds that this procedural requirement has minimally been adhered to by the Plaintiffs.
C. Lack of Negative Vote by the Town Council
The Act requires that within ten (10) days of receiving the Commissioner's response, the chairperson of the school committee may submit a written request to the town council to meet to decide whether or not to increase the appropriation for schools to meet expenditures, and that "in the event of a negative vote by the appropriating authority," the school committee may bring an action in Superior Court. Section 16-2-21.4. The Defendants argue that there was never a "negative vote" of the Johnston Town Council, and therefore this Court lacks jurisdiction.
Exhibit 10 indicates that the Commissioner's response to the waiver request was received in the Superintendent's office on November 17, 2004. By letter dated November 23, 2004, the Chair of the School Committee wrote to the President of the Johnston Town Council, advising of the Commissioner's action, and requesting an increase in the town's appropriation. (Pls.' Ex. 11). This letter concluded with the following: "Because of the urgency of this issue, if we have not heard from you within fifteen (15) days, the School Committee will assume that the Town Council has not acted favorably on our request and will proceed accordingly."
The evidence reflects no response to the November 23, 2004 letter. The Town also called no witness who was able to testify that there was any response to the November 23, 2004 request to the Town Council, or any Town Council meeting to consider the request. Although the statute does in fact use the words "negative vote," the Court must read that phrase in the context of the entire statute, and interpret the words of a statute in a manner that avoids an interpretation that would reach an absurd result. See, e.g., Cranston Teachers' Assoc.,424 A.2d at 650. Were the Court to read the term "negative vote" as the Town suggests, a recalcitrant town council could, by refusing to schedule a vote on a school committee's request, cause the Court to be barred forever from exercising jurisdiction under the Caruolo Act. The School Committee, therefore, substantially followed the procedure set forth in the Act, and in good faith made one final attempt to bridge the budgetary gap, and in doing so allowed a reasonable amount of time for the Town Council to respond. Even if the Town Charter or the press of other business prevented the actual reconsideration of the Johnston School Department budget within the fifteen (15) days set forth in the Chairman's letter, some response would have been appropriate. In the absence of any response whatsoever, the School Committee and this Court are entitled to consider the absence of a vote as constituting a negative vote. The School Committee, after waiting fifteen (15) days, thereafter properly invoked the jurisdiction of the Court and filed suit in furtherance of the procedures set forth in the Act.[10]
 FINDINGS OF FACT
In accordance with the provisions of Super. Ct. R. Civ. P. 52(a), and in addition to those factual findings incident to the jurisdictional analysis, the Court makes the following findings of fact:
1. Plaintiff Johnston School Committee is the duly elected body entrusted with the care, custody, management, and control of the public schools of the Town of Johnston in accordance with the provisions of § 16-2-9.
2. Plaintiff Iacovelli is the duly appointed Superintendent of Schools of the Town of Johnston, and exercises executive authority over the Johnston Public Schools in accordance with Gen. Laws 1956 § 16-2-11.
3. The Johnston School Department serves over 3,200 students in nine school facilities, including an early childhood center (K and pre-K), six elementary schools (grades 1-5), a middle school (grades 6-8), and a high school (grades 9-12). The Johnston School Department employs approximately 500 staff, inclusive of approximately 300 teachers. The teachers, or certified staff, are covered by a collective bargaining agreement that began on September 1, 2002, and extends to August 31, 2005. The non-certified staff is covered by a collective bargaining agreement which commenced on July 1, 2002, and concludes on June 30, 2005. The cumulative financial impact due to contractually required increases over three years for the two union contracts to which the School Committee is a party is approximately $2.1 million.
4. The Defendants — Santilli, Pitochelli, Manzi, Russo and DiMaio — are the duly elected members of the Johnston Town Council. As such, they are the appropriating authority for municipal government in the Town of Johnston in accordance with § 16-7-24. Defendant Macera is the duly elected Mayor, and Defendant Connors is the duly appointed Finance Director of the Town of Johnston.
5. In connection with the school budget process for the 2003-04 school year, the Town and the School Committee avoided the need to invoke the jurisdiction of the Superior Court under the Caruolo Act by negotiating a resolution. In connection with that resolution, the Town engaged the services of MGT of America from Tallahassee, Florida, to conduct a Performance Audit of the Johnston School Department. That Performance Audit was completed on June 23, 2004, and the final report of MGT was introduced as Exhibit 3. The Performance Audit made no recommendations with regard to cost-cutting measures for the 2004-05 school year. Recommendations having significant fiscal impact in the form of cost savings were recommended for fiscal years commencing with the 2005-06 fiscal year, and the three fiscal years thereafter. Such measures include the elimination of certain teaching and non-teaching positions, as well as the closure of two elementary schools. The total five year net savings as a result of the proposed recommendations of MGT would be $12,835,190.
6. Prior to its submission of a budget for the 2004-05 school year, the Johnston School Department, through its Director of Administration, collected data, including contractual obligations, estimates of fixed costs for utilities, transportation, maintenance, and professional development. He conferred with principals, the Special Education Director, the Facilities Director, and the Superintendent. In March 2004, the School Committee proposed a budget for fiscal year 2004-05 of $41,802,325. Exhibit 20 is a copy of the proposed budget submitted to the Town Council as of March 9, 2004.
7. On April 6, 2004, the Mayor submitted his proposed Town budget to the Town Council for the 2004-05 fiscal year. The Mayor's budget proposed an appropriation for the Johnston School Department which, together with state aid and other revenue, totaled $39,722,144. The shortfall between the Town's appropriation and the Johnston School Department's request was $2,080,181. The Town Council approved the Mayor's budget request for the Johnston School Department without any change on June 30, 2004.[11] Although there was some form of "budget workshop" between the Town Council and representatives of the Johnston School Department on or about June 1, 2004, there was no testimony suggesting that at such workshop there was any meaningful exchange of ideas as to particular budget items that could be addressed to meet a smaller appropriation than that which was requested. Between the date of the submission by the Johnston School Department to the date of final appropriation by the Town Council, there was virtually no communication or dialogue between the Johnston School Department, the School Committee, the Town Council and the Mayor concerning the school budget and specific items that might be considered for elimination or waiver.
8. By letter dated June 7, 2004, the Superintendent requested that the Commissioner of Education waive what she believed to be a requirement that a course in Family and Consumer Science be offered at the middle school and high school. The Commissioner replied by letter dated June 22, 2004, that the courses were not required and accordingly no waiver was necessary under the proposal outlined by the Superintendent.
9. At the School Committee meeting held on July 27, 2004, the School Committee Resolved to amend its budget by reducing its expenditures to the amount appropriated by the Town Council. Under the same Resolution, the School Committee directed the Superintendent to prepare a compilation of such changes to the budget that would accomplish the necessary expenditure reduction, and to present such a revised line item proposal within sixty (60) days.
10. In the sixty (60) day period between July 27, 2004 and September 27, 2004, the School Committee engaged the services of B E to assist the Johnston School Department in reducing the various items in the budget to only those items that were necessary to maintain minimum programming as is required by state and federal law, regulation, and contracts that were binding on the School Committee.
11. Thomas Sweeney works as a consultant to B E, a CPA firm having significant experience in the area of public school finance. He has previously been engaged both by school committees and towns or cities, as appropriating authorities, to consider a particular school department budget to determine if the budget is reflective of only that which is necessary to meet minimum statutory and regulatory requirements, including a state's BEP and contractual commitments. His background in the area of school finance includes his service for a period of twelve (12) years as Superintendent for the West Warwick School Department. Since his college graduation, he has served as a teacher and an assistant high school principal, as well as a director of career and vocational education. He began as a consultant with the firm of B E in 1995, and has conducted budget reviews in at least ten different communities in Rhode Island. His expert qualifications have been accepted in both the Family and Superior Courts of Rhode Island. In this case, he has examined the March 2004 budget submitted by the Johnston School Department, and has also examined the previous five (5) years of school department budgets in Johnston to consider budgeted amounts and actual expenditures. He met with the Superintendent and Finance Director, and made determinations based upon his knowledge and experience in the field of Rhode Island school finance. His analysis of the Johnston school budget followed a "zero base" budget approach as to each category of expenditure, and made adjustments to the budget in accordance with his review, his experience, and his familiarity with the requirements of educational mandates, as well as his knowledge of the BEP.
12. As a result of the detailed review by Mr. Sweeney, several items that were incorporated in the March budget were eliminated or reduced. Certain new positions contemplated in the March budget were eliminated. Some salaries originally charged to local funding were determined to be eligible for federal funding.
13. At the same time, it was discovered that since the original March budget had been submitted, there had been an unanticipated increase in out-of-district special education tuitions of over $1 million. Much of the increase was as a result of the arrival in the Town of new special needs children whose education became the responsibility of the Johnston School Department. There were also some unanticipated increases in utility costs, and a change in Medicaid regulations resulting in fewer Medicaid reimbursements available to shelter certain items previously reimbursable.
14. As a result of both the increases and decreases in earlier projections, a new effort at establishing an accurate school department budget for 2004-05 was attempted as of September 28, 2004. (Pls.' Ex. 23). According to the September 28, 2004 budget plan, the net amount that the Johnston School Department believed was necessary funding to complete the school year became $42,417,045, an increase of $614,710 over March's estimated budget. Therefore, the funding shortfall increased by $510,638 from $2,080,191 to $2,590,829.
15. The proposed budget plan prepared in September 2004, which increased the Johnston School Department's projected budget shortfall by an additional $510,638, was never either presented to the Town Council or discussed in any meeting held between the School Committee and the Town Council.
16. Notwithstanding the budget shortfall, in June and July 2004, the School Committee voted to extend the personal services contracts of several administrative personnel, including the Superintendent, Assistant Superintendent, Director of Administration and others. In some instances, the administrative personnel were given raises simultaneously with a reduction in the number of required work days. (Pls.' Ex. 19). These positions are not covered by either of the two collective bargaining agreements which pertain to the School Committee. The financial impact in 2004-05 of the raises approved for certain administrative personnel was approximately $60,000.
17. In light of the anticipated underfunding, the Superintendent wrote to the President of the teachers' union on December 1, 2004, requesting consideration of a 3.3% reduction in pay for teachers during the second semester of the 2004-05 school year. (Pls.' Ex. 12). The Union responded that in light of contractual obligations, the Union was unwilling to make the requested wage concession. (Pls.' Ex. 13).
18. Also in light the budget constraints, the Superintendent initiated a temporary purchasing freeze effective September 17, 2004, and extended that freeze by memorandums dated December 14, 2004, and February 16, 2005. (Pls.' Exs. 8, 14 and 15).
19. When it became apparent that there was a significant shortfall between appropriated funds and the amounts that the School Committee, in consultation with the accounting experts they had engaged, believed was minimally necessary for the Johnston School Department to meet its legal obligations, the Committee, by resolution adopted on October 26, 2004, (with one dissenting vote), authorized the Superintendent to commence the Caruolo Act process. (Pls.' Ex. 9).
20. In accordance with that authorization, the Superintendent sought waivers from the Commissioner as outlined in the jurisdictional analysis supra. When the requested waivers were denied, the School Committee made a final request for additional appropriations from the Town Council. That final request, made by letter dated November 23, 2004, was never responded to by the Town Council.
21. Messrs. Sweeney and Edge continued their efforts to bring the Johnston School Department's revenue needs in line with allocations. Mr. Sweeney prepared spread sheets which evidenced his effort to go through the financial needs of each segment of the budget on a line-by-line basis, and make reductions or additions to items to bring each in line with accurate estimates, as well as to bring each in line with what he believed were required expenditures. (Pls.' Ex. 26). As of December 14, 2004, Mr. Sweeney determined that the Johnston schools required an additional $2,218,111 beyond that which was available from all sources, including the Town's appropriation, in order to complete the school year in compliance with legal and contractual requirements. In addition, he found that with the previously enumerated salary reductions and job eliminations, together with various other areas wherein cost reductions could be made without violating legal or contractual requirements, a savings of $1,589,324 was possible. Accordingly, he computed the total shortfall as of December 14, 2004, to be $2,708,968. The $250,000 representing the current fiscal year's portion of the so-called "deficit reduction plan" was eliminated from the 2004-05 school year budget.
22. In anticipation of their expected Court testimony, Messrs. Sweeney and Edge refined their numbers even more as of March 5, 2005. With all additions and reductions accounted for as of that date, the final shortfall which the Plaintiffs' experts testified is minimally necessary to complete the 2004-05 school year was $2,346,061.
23. The $250,000 which the School Committee had originally included in the March 2004 budget as necessary for deficit reduction was eliminated from the final version of the budget, based upon a determination that the amount was not yet part of a deficit reduction plan approved by the Auditor General in conformity with § 16-2-9, and therefore was not an amount that was required by law to be included in the 2004-05 budget.
 CONCLUSIONS OF LAW
The dynamic which gives rise to the instant dispute is a creature of the legal structure of public education financing in the State of Rhode Island. When a dichotomy exists between the publicly elected municipal entity charged with the responsibility of running the public schools and the publicly elected municipal legislators who bear the responsibility of appropriating scarce municipal resources among competing interests, collisions of power and priority are inevitable. In the Town of Johnston, the collision course appears to have been years in the making.[12]
Article XII of the Rhode Island Constitution provides that the State is required to provide all children with a public education. That responsibility has been delegated by the State to local school committees. Section 16-2-9. Having been delegated this responsibility, school committees act as agents of the State, and not as agents of the municipality. CoventrySch. Comm. v. Richtarik, 122 R.I. 707, 712, 411 A.2d 912,914 (1980) (citing Cummings v. Godin, 119 R.I. 325, 377
A.2d 1071(1977)). According to the provisions of § 16-2-9, the Johnston School Committee is responsible for the entire care and control of the schools, including personnel, administration, contract negotiation, and budget allocation. The authority of the School Committee is expansive and exclusive. Its limitation, however, is not intrinsic, but rather occurs as a result of its dependence on outside sources to raise funds by taxes, and then subsequently allocate those funds to the school department.[13]
On this foundation of public school financing, the General Assembly constructed a very limited role for the Superior Court. This Court neither serves as a "super school committee," nor is it charged with the responsibility of making informed educational judgments as to the appropriate mix of programs, or the staff necessary to carry out such programs. The Court is not responsible under the Caruolo Act for ensuring the highest quality educational experience for the children of any community, including the Town of Johnston. Rather, the Court has only one function under the Caruolo Act — to determine whether the school committee has proven that it lacks the ability to run the schools for a particular school year with a balanced budget, within the previously authorized appropriation, while adhering to the mandates of state and federal law, regulation, the BEP, and its duly authorized contractual obligations. See Gen. Laws 1956 §§ 16-2-21.4, 16-7-23,16-7-24; see also Cranston Sch. Comm., 2004 WL 603408, at *2; Exeter-West Greenwich Reg'l Sch. District v. Townof Exeter and Town of West Greenwich, No. C.A. 95-5513, 1996 WL 936929, at *2 (R.I. Super. May 13, 1996);Coventry Sch. Comm., 1996 WL 936874, at *10.[14] The Court is further limited as "[i]n no event shall any court order obtained by the school committee have force and effect for any period longer than the fiscal year for which the litigation is brought." Section 16-2-24.1(b). Thus, while school committees and municipal councils are required to be engaged in a three-year budget forecasting process, see Gen. Laws 1956 § 16-2-21.2,[15]
this Court's review is limited to one fiscal year at a time.
Thus, the Court is limited in its coercive authority and may only order additional appropriations if it finds that such funds are required by the school committee to fund legally mandated expenditures. Funds necessary for more expansive or enriching programs, while perhaps educationally appropriate, cannot properly be the subject of a Court order. See Exeter-West GreenwichReg'l Sch. District, 1996 WL 936929, at *2; see alsoCoventry School Comm., 1996 WL 936874, at *1.
We therefore turn to the record in this case. The Court heard testimony during the course of four and one-half trial days. In the course of the trial, the School Committee presented testimonial and documentary evidence from three fact witnesses and two experts in the field of educational financing in Rhode Island. The experts were Mr. Edge, a forensic accountant experienced in the field of public education, and Mr. Sweeney, an experienced educator, fluent in the process of public financing in Rhode Island. Neither witness was captive to any one side in the dispute, since each has consulted and in fact testified both for school committees, as well as city or town councils. The Court was impressed with the thorough manner by which each witness reviewed and re-reviewed the School Committee's budget in an effort to bring the budget in line with bare minimum requirements. Ms. Iacovelli also testified at length as to her efforts towards achieving financial responsibility.
Surprisingly, the Court heard little testimony from the Defendants, and no testimony from any experts engaged by the Defendants. In contrast to the Plaintiffs' witnesses — three of whom testified that without the funds requested in the School Committee's budget plan, as most recently updated in March of 2005, the Johnston School Department will be unable to meet its legal and contractual obligations — the Defendants offered not a single witness who was able to testify to the contrary. Rather, the Town relied almost exclusively[16] on its cross examination of the Plaintiffs' witnesses in an effort to gain from those witnesses testimony supportive of the Town's defense. The apparent object of the Town's examination was to inquire whether there were portions of the budget, either particular programs or staff, that could have been excised without putting the School Committee in jeopardy of violating the BEP or other legal or regulatory requirements. The problem with such a scattershot approach is that the vast majority of programmatic requirements are couched in terms that require the Superintendent to make subjective judgments as to adequacy of staff and resources. The "big ticket" items, such as outof-district tuitions necessary to meet the needs of students with specific disabilities or learning differences, are mandated both by federal and state requirements. Even the provision of bussing services within the district, while subject to some flexibility in terms of routes and bus monitors, is rather inflexible when factoring in subjective judgments that must be made relative to ensuring the health and safety of students. Similar factors play a role in the determination of the adequacy of programs, such as physical education, guidance, industrial arts, art and music. Further, in order not to run afoul of the teacher tenure requirements of state law, any decision not to renew a teacher's contract must be made on or before March 1 of the year previous to the subject fiscal year. See Gen. Laws 1956 § 16-13-2.
This Court believes, based on the unrebutted and credible testimony of Plaintiffs' witnesses, that the Plaintiffs have shown diligence and good faith in their attempts to limit spending to those staff and programs minimally necessary to carry out their legal obligations. Were the Court to rule otherwise based on the record before it, the Court would be engaging in rank speculation that there must be some staff, or some administrator, or some program, or some teacher that could be eliminated without placing the School Committee in legal jeopardy. The record, as it exists, simply does not permit such a finding.
The Town is critical of the School Committee for having entered into extensions of certain personal service contracts with administrators, or not having "laid-off" union employees in a manner consistent with the Union contracts, during a period when the School Committee was aware of previous deficit budgets and that the Town Council's appropriation was more than $2 million less than that requested by the School Committee. However, once these contracts became binding obligations of the School Committee, the Court has no discretion but to require that the Town Council fund all contractual obligations. See Exeter-West Greenwich Reg'lSch. Dist., 489 A.2d at 1020.
The Town is suggesting that the Johnston School Committee, by subjecting certain positions to contractual commitments, ends up controlling the purse strings of municipal government by compelling the funding of those positions. Yet, in the municipal balance of power, the General Assembly, and our Supreme Court as the final arbiter of state law interpretation, have given that broad authority to school committees. Thus, the remedy for a taxpayer concerned that a school committee has overcommitted municipal resources to unnecessary contractual agreements is the exercise of political control by electing school committee members who may be more fiscally conservative in educational spending. Although contracting for higher salaries or greater benefits may seem insensitive in a time of fiscal crisis, such contracts are not illegal in light of the broad authority of school committees. The Caruolo Act is not designed to have the Court substitute its judgment for that of a school committee when considering the exercise of the particular committee's contracting authority. Even if a particular contract is in excess of what may be minimally necessary to fulfill statutory, regulatory or BEP requirements, once the school committee becomes contractually bound, the issue is outside the scope of this Court's authority under the Caruolo Act.[17]
It appears to the Court that both the School Committee and the Town Council, rather than engage in a meaningful give and take aimed at identifying those portions of the proposed budget that were unnecessary, engaged in a process of brinksmanship, with each side, at different moments in the process, throwing down the gauntlet of judicial intervention.[18] The School Committee met the challenge by engaging the services of experts to take the proposed budget apart piece by piece, and put it back together, leaving only what the outside consultants believed was the minimum necessary to fulfill the School Committee's legal obligations. Had the Town similarly engaged in such a detailed process, it may have initially convinced the School Committee that there were areas in the budget that were not required or for which waivers or alternatives could have been considered by the Commissioner. The Town would also have been prepared to meet head on, with testimony and exhibits, the conclusions of the Superintendent and the Plaintiffs' experts. Having failed to do so, the Court is left only with the uncontradicted facts presented by the School Committee that they are unable to complete the school year without a further appropriation ordered by this Court, and the unsupported speculation that there may indeed be items overlooked in the process.
The Court is mindful of the limitations the Caruolo Act places on the Court. First of all, the Court must approach each school year as a separate, stand-alone inquiry. This is a difficult task, especially when considering that there are impacts, particularly contractual obligations, which a school committee encounters well in advance of the budget process for a particular school year. This leaves the Court with an obligation to order the funding of contracts in a particular school year that may have been entered or extended in previous years.
Another limitation of the Act is that felt by the local taxpayers in a particular community. State and federal agencies, as well as the legislatures at both the state and federal levels, have enacted a considerable number of programs and requirements for local educators.[19] Each of the programs, standards or requirements has a "price-tag" attached to it. It is this compilation of legal minimums which the Court is obliged to recognize under the Caruolo Act. Yet, with some exceptions, the vast majority of the programs which the state or federal governments require local communities to adhere to do not come with state or federal dollars that can be used to defray the cost to a local community. That is one of the ultimate dilemmas not addressed by the Caruolo Act. This Court has one option and one option only: if it finds that the cost of a program is required to meet state or federal requirements, the Court must order the local appropriating authority to fund the program.[20]
 CONCLUSION
Based upon the findings of fact and conclusions of law set forth above, the Court determines that without an additional appropriation in the amount of $2,346,061, the School Committee will be unable to adequately run the public school system in the Town of Johnston for the 2004-05 school year — meaning that the School Committee will be unable to maintain compliance with state and federal law and regulation, the BEP, and contractual agreements binding on the School Committee. Accordingly, the Town Council of the Town of Johnston is hereby ordered to cause such appropriation to be added to the Johnston School Department's budget for the 2004-05 school year.[21]
Counsel shall present an appropriate form of order and judgment consistent with findings and conclusions of this decision.[22]
[1] Waivers "which affect the health and safety of students or staff" and which violate the provisions of law relating to the education of students with disabilities, are not proper candidates for waiver consideration under § 16-2-21.4(a).
[2] This Court agrees with the observation made by Mr. Justice Silverstein in Coventry Sch. Comm. v.Coventry Town Council:
 "Predicated on the foregoing, this Court finds that our law requires that the Town appropriate to the School Committee an amount which together with state and federal aid (and other revenues) is not less than the costs of the basic program together with the costs of other state or federally mandated programs and also the costs of collective bargaining and other lawfully incurred obligations." No. C.A. 95-6253, 1996 WL 936874, at *10 (R.I. Super. Jan. 17, 1996) (citing Exeter-West Greenwich Reg'l Sch. Dist. v. Exeter West Greenwich Teachers' Ass'n, 489 A.2d 1010
(1985)).
[3] Prior to trial, Defendants filed a motion to dismiss pursuant to Super. Ct. R. Civ. P. 12(b)(6). Essentially, the Defendants argued that the Plaintiffs failed to follow the stipulated statutory procedures, entitling them to dismissal of the Complaint. The Court at that time denied the motion and ruled that adherence to the jurisdictional prerequisites required consideration of facts and determinations in the context of a factual record. At the close of the Plaintiffs' case, Defendants renewed their jurisdictional arguments in connection with a motion pursuant to Super. Ct. R. Civ. P. 52(c). The Court reserved ruling on that motion until the conclusion of the case.
[4] The BEP was originally enacted after the Rhode Island Legislature amended Gen. Laws 1956 § 16-7-24 in 1983 and provided that "[t]he board of regents for elementary and secondary education shall adopt regulations for determining the basic education program and the maintenance of local appropriation to support the basic education program." Section 16-7-24. The BEP was revised in March 1989, which revised version was introduced as Plaintiffs' Exhibit 2 in these proceedings.
[5] Ms. Wood testified that the Commissioner has interpreted the Caruolo Act to exclude waivers of regulations "which are the regulatory embodiment of statutory requirements." This interpretation appears entirely consistent with the mandates of the statute.
[6] Staffing for school libraries, for example, is established in accordance with per pupil minimums. See Rhode Island Board of Regents,Basic Education Program for Rhode Island Public Schools, at 201 (1989).
[7] For example, standards relating to health education in the BEP provide that "[e]ach school district's superintendent shall be responsible to provide an adequate number of personnel for a school health program . . . in accordance with the statutory and regulatory requirements." Rhode Island Board of Regents, Basic Education Program for Rhode Island PublicSchools, at 80 (1989). The standards for administration and management services provide that "[e]ach school district shall be organized in an efficient manner, with properly trained personnel to effectively carry out its administrative and management functions." Rhode Island Board of Regents, Basic Education Program for Rhode Island Public Schools, at 334 (1989). The BEP further provides: "The number of staff members should be adequate for the educational program, the school enrollment, and the special needs of the students. The teaching load and the total working load should be such that maximum efficiency in services is assured." Rhode Island Board of Regents, Basic Education Program for Rhode IslandPublic Schools, at 345 (1989).
[8] Mr. Justice Silverstein observed: "The Court notes that the request for waivers was replete with observations by the School Committee to the effect that the requested waivers were, in the opinion of the School Committee, not in keeping with the best interests of the students of the Coventry school system or were violative of pertinent statutes or regulations. Particularly, in light of those observations it is not surprising that the Commissioner either denied each and every waiver request based on the likelihood of an adverse impact on the Basic Education Program (BEP) or federally mandated programs and standards. . . ." Coventry Sch. Comm., 1996 WL 936874, at *3. In similar fashion, Mr. Justice Procaccini observed: "It is obvious to the court that this statutory requirement [of waiver requests to the Commissioner] was barely satisfied and is best described as a perfunctory, half-hearted exercise by the school committee that they knew would be rejected in all respects by the Commissioner." Cranston Sch. Comm. v. City of Cranston, No. PC 03-5110, 2004 WL 603408, at*1, n. 3 (R.I. Super. Ct. March 8, 2004).
[9] The Court excluded evidence offered by the Plaintiffs that the Commissioner has denied waiver requests made in connection with the school budget process in other municipalities. The Commissioner's denial of other requests is not pertinent to the jurisdictional requirement that a school committee must request waivers, even if in other circumstances the Commissioner has refused to grant them.
[10] It has not been suggested that the Town intentionally appropriated a sum less than that requested by the School Committee in order to bolster a jurisdictional argument. However, taking the Town's argument to its legal conclusion, the very act of a tightfisted town allegedly "underfunding" a school department could form the basis of an alleged jurisdictional defect that would prevent any meaningful judicial review. A town, by "low balling" an appropriation well below a school department's threshold of legal commitments, could then argue that the school committee's failure to adhere to spending restrictions that would result in its non-compliance with educational mandates required by law would preclude judicial review. Similarly, its failure to request waivers nearly impossible to obtain, or a town's refusal to act upon a meaningful request for reconsideration by the school committee, could prevent the Court from considering the merits of a school committee's Caruolo Act claim. An argument that potentially creates such an awkward circularity resulting in the Court's failure of jurisdiction is unpersuasive.
[11] State education aid provided to the Town was $51,072 more than the original amount anticipated. Accordingly, the budget amount appropriated from all sources as of June 30, 2004 was $39,773,216. (Pls.' Ex. 22).
[12] Testimony reveals that the School Committee has operated the school department from a deficit position over the last two years. Feuds have also erupted in recent years in the Town of Johnston over issues concerning whether the Town Solicitor, under the prevailing Charter provisions, is required to serve as counsel to the School Committee, or whether the Committee is free to hire counsel separate from the Solicitor. See Town of Johnston v. Santilli, No. C.A. 03-0219, 2004 R.I. Super. LEXIS 138 (R.I. Super. August 2, 2004).
[13] Essentially, a school committee's funding derives from a town's appropriation, state aid, and federal funding and grants. Although the town treasurer receives funds allocated by these sources for public education, the town must separately account for its receipt of such funds, and pay the funds over to the school committee, provided that school expenditures not exceed, in any fiscal year, the sums appropriated for the schools. Gen. Laws 1956 § 16-9-1.
[14] Although the statute does not explicitly refer to contractual obligations, our Supreme Court has concluded that a school committee's valid contractual obligations must be funded by municipal appropriating authorities. Exeter-West Greenwich Reg'l School District,489 A.2d at 1020.
[15] In this case, neither side introduced evidence as to whether the statutorily required three-year process was adhered to in the Town of Johnston.
[16] The Defendants did call three members of the School Committee as witnesses. Their testimony, although addressing some of the travel of the 2004-05 budget from its inception to the filing of this suit, was not helpful as to any portions of the proposed budget which the Defendants believe are not required by state or federal law, regulation, the BEP, or contract.
[17] Alternatively, the General Assembly could consider revisions to the statutory framework such that contracts entered into by school committees (arguably inclusive of collective bargaining agreements) are of no force and effect until they are funded by the appropriating authority. For instance, reference was made in the Exeter-West GreenwichReg'l Sch. Dist. case to New York and Pennsylvania statutes which provide that collective bargaining agreements are not binding absent funding.489 A.2d at 1018. Such a radical change in the balance between school committees and appropriating authorities, however, is not the proper subject of judicial scrutiny, but must be addressed and resolved in the legislative arena.
[18] Robert LaFazia, Vice Chairman of the School Committee, admitted that he made the remark in June 2004 that if the School Committee did not get what it wanted from the Town Council, the Committee would go to Court. Mr. Santilli, the Chairman of the School Committee, testified that when he mentioned to Robert Russo, President of the Town Council, that the school department needed more than the $39 million appropriation, he replied "take us to court."
[19] Attached to Plaintiffs' post-trial memorandum is an appendix entitled "mandates." The document is a thirteenpage compendium of the myriad of state and federal laws and regulations that constitute requirements that local school departments must address.
[20] The Court takes note of a recent article concerning the Attorney General of the State of Connecticut. It was reported that he intends to mount a legal challenge to the federal "No Child Left Behind" education law, on the basis that the cost of implementing the program falls on state and local government, without the federal government providing sufficient additional aid to defray such costs. See Sam Dillon,Connecticut to Sue U.S. Over Cost of School Testing Law, N.Y. Times, April 6, 2005, at B1. More recently, it has been reported that the National Education Association (NEA) has joined other plaintiffs in a similar challenge filed in a United States District Court in Michigan.See Ben Feller, Suit Challenges Unfunded School Mandates, Providence Journal, April 21, 2004, at A3.
[21] Because budget estimates, by their nature, may not match dollar for dollar the ultimate cost, nothing in this Order shall be construed to require the School Committee to spend all additional funds that have been ordered. See Coventry Sch. Comm., 1996 WL 936874, at *11.
[22] Prior to concluding its case, the Defendants filed a motion to amend their answer to raise certain affirmative defenses, including the doctrine of unclean hands, the defense that certain contracts entered into by the School Committee were void ab initio, and breach of fiduciary duty. This Court took the motion under advisement. The Defendants, prior to trial, filed a motion to dismiss which served to alert the Plaintiffs of several of the defenses sought to be raised by amendment. As to the contract defense, it was the Plaintiffs themselves that introduced evidence of certain contracts entered into by the School Committee. The Plaintiffs' counsel did not object to the introduction of any evidence presented at trial by the Defendants on the ground that the evidence was not within the issues raised in the pleadings. See Fram Corp. v. Davis,121 R.I. 583, 401 A.2d 1269 (1979). Accordingly, these defenses were tried "by express or implied consent of the parties" in accordance with Super. Ct. R. Civ. P. 15(b). See Kenney v. Providence Gas Co.,118 R.I. 134, 372 A.2d 510 (1977). The Court, however, rejects these defenses as both factually and legally insufficient. The Court finds that the Superintendent and the School Committee acted in good faith and did not exceed the authority afforded to them by law. Further, the Plaintiffs, although having various statutory obligations, cannot be said to stand in a fiduciary relationship with the members of the Town Council or the other Town officials.